**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti (*pro hac vice*)
7 Times Square, 27th Floor
New York, New York 10036
jfonti@bfalaw.com
Tel: (212) 789-1340
Fax: (212) 205-3960

*Counsel for Lead Plaintiff Jean-Pierre Murray,*
*and Lead Counsel for the Class*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALBERT CHOW, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ENOCHIAN BIOSCIENCES INC., MARK DYBUL, RENE SINDLEV, and CARL SANDLER, <br><br> Defendants. | Case No. 8:22-cv-01374-JWH-JDE <br><br> <u>CLASS ACTION</u> <br><br> **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

# **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION..........................................................................3

II.     JURISDICTION AND VENUE....................................................................8

III.    PARTIES.......................................................................................................8

        A.   Lead Plaintiff ....................................................................................8

        B.   Defendants ........................................................................................9

        C.   Gumrukcu and Affiliated Persons and Entities ...........................10

IV.     SUBSTANTIVE ALLEGATIONS............................................................11

        A.   Relevant Background........................................................................11

             1.   Sindlev and Gumrukcu Formed the Company in 2018, Creating Value Out of Thin Air by Assigning the Company Fictitious Intellectual Property Assets ...........................................................11

             2.   Defendants Hid Gumrukcu's Falsified Credentials and Long History of Fraud ..........................................................................14

             3.   Enochian Failed to Reach Commercial Viability ..............................17

             4.   Defendants Funneled Tens of Millions of Dollars Outside the Company Throughout the Class Period .............................................19

             5.   Defendants Went to Great Lengths to Conceal Gumrukcu's Sordid History................................................................................................20

             6.   Hindenburg Research and *The Wall Street Journal* Revealed the Full Truth in June 2022....................................................................24

             7.   Enochian Recorded Massive Impairment and Wrote Down the Value of the Intellectual Property Acquired from Gumrukcu ............26

             8.   Defendants' Conduct Led to Numerous Related Litigations..............28

        B.   False and Misleading Statements and Omissions.......................................31

        C.   Summary of Scienter Allegations.................................................................36

1. Defendants Were Intimately Involved in Promoting Gumrukcu and His Purported Intellectual Property, Which Was the Sole Basis of Enochian's Value ..................................................36

2. Company Executives Raised Red Flags About Gumrukcu's Past, but Defendants Silenced Them ..........................................38

3. Defendants Were Motivated to Defraud Investors for Personal Gain .........................................................................39

4. In the Alternative, Defendants Acted with Deliberate Recklessness in Disregarding Gumrukcu's Falsified Credentials and Fraudulent Past ......................................................................40

5. Corporate Scienter.............................................................40

V.    LOSS CAUSATION ........................................................40

A.    The Hindenburg Report Revealed Defendants' Misstatements ................41

B.    The Wall Street Journal Publishes Additional Revelations........................42

VI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE................................................................42

VII.    PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE ......................................................................43

VIII.    CLASS ACTION ALLEGATIONS..............................................44

IX.    CLAIMS FOR RELIEF.........................................................46

X.    JURY TRIAL DEMAND.......................................................48

XI.    PRAYER FOR RELIEF........................................................48

Court-appointed Lead Plaintiff Jean-Pierre Murray ("Lead Plaintiff") brings this action on behalf of himself and all those who purchased or otherwise acquired Enochian common stock during the period of January 17, 2018, and June 27, 2022, (the "Class Period"), both dates inclusive, and were damaged thereby (the "Class").

Lead Plaintiff alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company (as defined below) and certain of its top officials.

The allegations are based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel. Lead Counsel's investigation included, among other things, a review and analysis of Enochian's SEC filings, press releases issued by Enochian, news and media reports concerning the Company, research reports issued by financial analysts, and other publicly available information. Lead Plaintiff believes that, after a reasonable opportunity for discovery, substantial additional evidentiary support will be available for trial that further supports the allegations in this Amended Complaint.

## I. NATURE OF THE ACTION

1. This Exchange Act class action arises from Defendants' material misstatements and omissions about the qualifications of Serhat Gumrukcu, the Company's founder and "Inventor." Defendants repeatedly represented Gumrukcu as a medical doctor and world-class disease researcher to the public and based the Company's entire business model on his purported HIV cure. In truth, as the Defendants knew or were reckless in not knowing, Gumrukcu was not a doctor, not a medical researcher, and his science was bogus.

2. When Defendants' misstatements and omissions were partially revealed on June 1, 2022, Enochian's stock dropped 29% in one day. After *The Wall Street Journal* published an article on June 27, 2022, exposing that the

AMENDED CLASS ACTION COMPLAINT

3

8:22-cv-01374-JWH-JDE

Company's former CEO was terminated for raising Gumrukcu's falsified credentials and fraudulent past with the Company's Board of Directors, Enochian's stock fell by an additional 20% in a single day, closing at $2.47 on June 28, 2022. Taken together, the revelations of the extent of the Company's false and misleading statements or omissions accounted for a total drop in stock price of 53% resulting in a loss of over $185 million in shareholder value.

3. Enochian Biosciences (now known as Renovaro BioSciences Inc. and f/k/a DanDrit Biotech USA, Inc.) ("Enochian" or "the Company") is a biopharmaceutical company formed in 2018, when Rene Sindlev, a Danish billionaire, and controlling shareholder in a failing biotech company called DanDrit Biotech USA ("DanDrit"), caused DanDrit to acquire Enochian Biopharma, an entity that Gumrukcu owned and controlled. Central to this transaction, Defendants repeatedly told investors that the Company's co-founder, Gumrukcu, was a reputable medical doctor, PhD, and a "prolific inventor." Indeed, the Company and Gumrukcu claimed to be developing miracle cures for HIV, as well as for AIDS, and hepatitis B ("HBV"). The acquisition was so pivotal that Sindlev and Gumrukcu changed DanDrit's name to Enochian Biosciences.

4. Defendants' praise of Gumrukcu was neither isolated nor off-the-cuff. Rather, Defendants engaged in a years-long, concerted effort to pass Gumrukcu off as a world-class medical doctor and researcher and to paint his research as extremely valuable. For instance, in a video posted to Enochian's website in March 2019, Enochian's CEO Mark Dybul said that "Enochian's inventor, Dr. Serhat has the type of brilliance that has the capacity to see across disciplines in science and connect things that others don't see. And that's exactly what he's done to create the most innovative approaches to HIV and oncology that I know of." A few months later, Dybul doubled down, saying that "Dr. Gumrukcu is one of those rare geniuses that is not bound by scientific discipline or dogma. He sees connections and opportunities often missed. His ideas are the purest kind: those that seem so obvious

and simple once he has conceived of, and explained them." Likewise, Sindlev, who served as the Chairman of Enochian's Board of Directors following the Company's 2018 founding, told investors in early 2019 that the Company's "researcher and inventor is the biotech world's answer to Zuckerberg, Bill Gates and Larry Page. People close to him compare him to Leonardo Da Vinci, Nicolas [sic] Tesla and Einstein in one and the same person." Enochian's website provided investors with an impressive, albeit fabricated, resume for Gumrukcu, stating that "Dr. Serhat Gumrukcu has been at the forefront of cell, gene and immunotherapy for more than a decade. After his medical training at Dokuz Eylul University (2004) and Istanbul Marmara University (2006), he continued his clinical training and practice in different centers around Europe including University of Edinburgh United Kingdom, Pierre & Marie Curie University Saint Antoine Teaching Hospital, France and Institute of Bioregulation St Petersburg, Russia."

5. Not only did Defendants tout Gumrukcu's purported expertise and brilliance, but they also tied the entire value of the Company directly and almost exclusively to the value of Gumrukcu's purported research. The merger that created Enochian involved the acquisition from Gumrukcu of "a License Agreement to the HIV therapy ("ENO-1001") which consists of a perpetual, fully paid-up, royalty-free, sublicensable, and sole and exclusive worldwide license to research, develop, [and] commercialize certain intellectual property in cellular therapies for the prevention, treatment, amelioration of and/or therapy exclusively for HIV in humans." At the time of acquisition, Enochian valued this intellectual property at $127 million. That accounted for a staggering 88% of the Company's $144 million in total assets at that time. That percentage would remain relatively consistent throughout the Class Period. In other words, the Company's very existence hinged on the success of Gumrukcu's research.

6. But contrary to the Company's repeated representations, Gumrukcu does not hold, and has never held, a medical degree—or any other degree for that

matter. Nor is he licensed to treat patients in any jurisdiction. Instead, he is a dangerous serial fraudster, who has lied, cheated, and even killed. In 2018, Gumrukcu was involved in a sham oil venture, in which he repeatedly falsified documents. When his former partner threatened to expose him, Gumrukcu hired a contract killer who abducted Gumrukcu's former partner from his home in front of his wife and children, executed him, and left his body on the side of a Vermont road. This was not the first time that Gumrukcu's deceit ended in an innocent death. In or around 2013, he took $275,000 from a cancer patient in Turkey who subsequently died after Gumrukcu administered bogus treatments. That led to a Turkish court issuing a bench warrant for his arrest and Gumrukcu fleeing the country. He then repeated the pattern in Pennsylvania in 2015, where he took $300,000 from a family to treat their child who was battling cancer. Again, Gumrukcu administered bogus treatments, the child died, and Gumrukcu was subject to a court judgment when the family sued.

7. None of this was disclosed to investors. Rather, Defendants knowingly hid Gumrukcu's falsified credentials and his sordid history from investors. In fact, Sindlev admitted after the fact that he knew about Gumrukcu's history of fraud and chose not to say anything to investors. Moreover, former CFO Robert Wolfe and former CEO Eric Liere both raised red flags to Enochian's Board about Gumrukcu's past and certain payments that the Company was making to Gumrukcu, but they were ignored and actively suppressed. Ultimately, they were both terminated.

8. Similarly, when media sources raised questions or concerns, Defendants reassured the market of Gumrukcu's credentials and qualifications and falsely claimed to have conducted sufficient due diligence, with, among other things, Sindlev claiming that the Company verified Gumrukcu's credentials.

9. But of course, even a cursory investigation would have revealed Gumrukcu's fraudulent and criminal past and, at an absolute minimum, that he was not a doctor or a researcher and did not hold any degrees. Thus, either Defendants

conducted an investigation, and it revealed the truth about Gumrukcu and they withheld that information, or Defendants never performed an adequate investigation while claiming that they did. Either way, Defendants are liable for securities fraud.

10. Defendants' reasons for engaging in securities fraud were personal. As explained below, to either save themselves from failed investments (like Sindlev's failed investment in DanDrit) or to cash out directly (like Sandler and Dybul who reaped sizeable proceeds from insider sales), Defendants happily went along with this swindler's con and either knowingly or recklessly repeated Gumrukcu's fraudulent claims. They not only closed their eyes to the red flags all around them, but they also punished anyone who raised concerns. To allow the truth to emerge would crater the Company's stock, dry up available capital, and put the brakes on any continued research. Defendants could not allow that to happen.

11. Of course, that's precisely what happened when the fraud was finally exposed. On June 1, 2022, Hindenburg Research published its proprietary investigation (the "Hindenburg Report") exposing Gumrukcu's falsified credentials and the worthless purported intellectual property he brought to the Company. Specifically, Hindenburg reported, based on interviews with current and former Enochian employees, reviews of foreign court documents, communications with foreign medical facilities and universities, and other first-hand evidence, that Gumrukcu was not a doctor. On this news, Enochian's stock plummeted nearly 29% in one day.

12. Then, on June 27, 2022, *The Wall Street Journal* disclosed new damning information that the Hindenburg Report had not revealed. Specifically, *The Wall Street Journal* revealed that Eric Leire, Enochian's former CEO, said "he began to suspect that Mr. Gumrukcu had fabricated his resume and held neither a medical degree nor a doctoral degree." The article further reported that Leire said he was fired in 2019 after raising his concerns with the Enochian Board, quoting him as saying "I thought the guy was a liar. Maybe just, you know, taking liberty with

science." On this news, Enochian's stock fell another 20% in one day. All told, the revelations caused a 53% decline in the price of Enochian stock and erased over $186 million in shareholder value.

## II. JURISDICTION AND VENUE

13. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act 15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Enochian is headquartered in this District at 2080 Century Park East, Suite 906, Los Angeles, CA 90067, Defendants conduct business in this District, and the acts and transactions giving rise to the violations of law complained of occurred in part in this District.

16. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

17. Lead Plaintiff, Jean-Pierre Murray ("Murray"), is an individual residing in Miami Beach, Florida. As set forth in the certification attached as Exhibit A to this Amended Complaint, Murray purchased Enochian common stock on the NASDAQ Exchange ("NASDAQ") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.     Defendants**

18.     Defendant Renovaro BioSciences Inc. f/k/a Enochian Biosciences f/k/a DanDrit Biotech USA, Inc., hereinafter referred to by its name throughout the Class Period, "Enochian," is a pre-clinical stage biotechnology company that purportedly researches and develops pharmaceutical and biological products for the human treatment of HIV, HBV, influenza and coronavirus infections, and cancer.  The Company is incorporated in Delaware with its principal executive offices located at 2080 Century Park East, Suite 906, Los Angeles, CA 90067.  Throughout the Class Period, the Company was known as Enochian and the Company's common stock traded on the NASDAQ under the ticker symbol "ENOB."   Presently, the Company's stock trades on the NASDAQ under the ticker symbol "RENB." Because Defendant Renovaro was known as Enochian at all times during the Class Period, this Amended Complaint shall refer to it throughout as "Enochian" or the "Company."

19.     Defendant Mark Dybul ("Dybul") has served as Enochian's Chief Executive Officer ("CEO") since July 2021. Prior to serving as the Company's CEO, Dybul served as Executive Vice-Chair of Enochian's Board of Directors (the "Board") at all relevant times.

20.     Defendant Carl Sandler ("Sandler") served as an Independent Director from February 2018 until March 2022.  He was also a member and manager of Weird Science LLC.

21.     Defendant Rene Sindlev cofounded Enochian and has served as Enochian's Chairman of the Board at all relevant times.

22.     Defendants Dybul, Sandler, and Sindlev are referred to herein as the "Individual Defendants."   The Individual Defendants possessed the power and authority to control and did control the contents of Enochian's SEC filings, press releases, and other communications to the market.  The Individual Defendants were provided with copies of these filings, press releases, and other communications

alleged herein to be misleading prior to or shortly after their issuance and they had the ability and opportunity to prevent such issuance or to cause them to be corrected. Because of their positions with Enochian, and their access to nonpublic material information available to them, the Individual Defendants knew, or at least recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are therefore liable for the false statements and omissions alleged herein.

**C.      Gumrukcu and Affiliated Persons and Entities**

23.    Serhat Gumrukcu ("Gumrukcu") was Enochian's co-founder and "Inventor." As detailed in this Complaint, during the Class Period, Defendants portrayed Gumrukcu as a medical doctor, PhD, and researcher who was developing cures for a wide array of illnesses. In reality, Gumrukcu was a serial fraudster with a long history of criminal activity. He is currently imprisoned and awaiting trial on murder charges stemming from allegations that he paid a hitman to kill a former business associate to prevent the associate from derailing Gumrukcu's work with Enochian.

24.    W. Anderson Wittekind ("Wittekind") is Gumrukcu's husband. He is also one of two managers of Weird Science LLC, an entity that held, and sold, significant portions of the Company's shares throughout the Class Period.

25.    Weird Science LLC ("Weird Science") is a California limited liability company formed in 2017. Upon information and belief, Gumrukcu, Wittekind, and Defendant Sandler were at one time members of Weird Science. At the time of DanDrit's acquisition of Enochian Biopharma, Weird Science owned approximately 97% of Enochian Biopharma. Weird Science continued to hold significant portions of the Company's shares throughout the Class Period.

26.    G-Tech Bio, LLC ("G-Tech") is a California limited liability company with its principal pace of business located at 8605 Santa Monica Boulevard, Suite

36381, West Hollywood, California 90069. Upon information and belief, G-Tech is owned, managed, and/or controlled by Gumrukcu and Wittekind. According to publicly available information supplied by the California Secretary of State, SG & AW Holdings LLC and Wittekind are the managers and/or members of G-Tech.

27. SG & AW Holdings LLC ("SG & AW") is a California limited liability company with its principal place of business located at 4142 Lankershim Boulevard Los Angeles, California 91602. Upon information and belief, SG & AW is owned, managed, and/or controlled by Gumrukcu and Wittekind. According to publicly available information supplied by the California Secretary of State, Wittekind is the sole manager and/or member of SG & AW. Upon information and belief, the "SG" and "AW" in the name of SG & AW are the initials of Serhat Gumrukcu and Anderson Wittekind.

28. Seraph Research Institute ("SRI" or "Seraph"), f/k/a G Health Research Foundation, is a California nonprofit corporation with its principal place of business located at 8605 Santa Monica Boulevard Suite 36381, West Hollywood, California 90069. Upon information and belief, SRI is owned, managed, and/or controlled by Gumrukcu and Wittekind. According to publicly available information supplied by the California Secretary of State, Gumrukcu is the Chief Executive Officer of SRI and Wittekind is the Secretary and Chief Financial Officer of SRI.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Relevant Background

**1. Sindlev and Gumrukcu Formed the Company in 2018, Creating Value Out of Thin Air by Assigning the Company Fictitious Intellectual Property Assets**

29. Sindlev and Gumrukcu met in 2016. Sindlev welcomed Gumrukcu into his life, going so far as to host Gumrukcu in his home and referred to him as his personal health guru. Demonstrating absolute faith in Gumrukcu, Sindlev went under the "doctor's" knife for treatment of a potentially cancerous growth.

30.    By early 2017, Sindlev controlled DanDrit, a publicly traded biopharma company. He promptly hired Gumrukcu ostensibly as a "consultant to improve the efficacy of [DanDrit's] vaccine protocol MCV" and paid him nearly $300,000 in cash and stock.

31.    But DanDrit was a failing company with limited to no commercial prospects. Its lead product, a cancer vaccine called MelcancerVac ("MCV"), never worked. Gumrukcu told Sindlev that DanDrit's shares "couldn't be given away." Faced with failure, Sindlev needed a path to save himself from the failing investment and to avoid significant scrutiny in Denmark surrounding his large stake and DanDrit's failure. His answer was to engineer with Gumrukcu a series of business formations and combinations to create hundreds of millions of dollars in value out of thin air from Gumrukcu's purported science. As shown below, the resulting entity—through a rather tortuous path—was Enochian.

32.    At around the same time that Sindlev obtained control of DanDrit, in March 2017, Gumrukcu incorporated Weird Science LLC, a California corporation based out of Gumrukcu's and his husband Wittekind's West Hollywood home. Wittekind was the sole manager of the entity at that time with Sandler later becoming a manager as well. Shortly thereafter, in May 2017, Gumrukcu and Wittekind created Enochian Biopharma. Enochian Biopharma's corporate formation documents show that its address was a UPS store less than a mile away from the couple's home. Their home also served as the corporate address for Weird Science. Both Weird Science and Enochian Biopharma shared the same stated corporate purpose of identifying, developing, manufacturing, and commercializing gene-modified cell therapy.

33.    On July 14, 2017, according to DanDrit's public filings, DanDrit simultaneously: (i) loaned Weird Science $500,000 for pre-clinical study programs, and (ii) signed a letter of intent to acquire Enochian Biopharma from Weird Science, including the license to a curative treatment for HIV and AIDS that Gumrukcu was

purportedly developing. In exchange, Weird Science received (i) 50% ownership in DanDrit and (ii) immediate forgiveness of the $500,000 loan. The transaction closed seven months later, in February 2018, after which DanDrit changed its name to Enochian.

34. The curative treatment for HIV to which Enochian acquired a license in the transaction, was formally referred to as ENO-1001, and was later renamed to ENOB-HV-001. ENO-1001 was immediately identified in Enochian's public filings as its "lead candidate." And indeed, it was recorded in Enochian's books as its single most valuable asset. Specifically, the license acquired from Gumrukcu and his affiliated entities was recorded by Enochian in its May 15, 2018, Form 10-Q as an "Indefinite Life Intangible Asset"—which generally refers to assets that could expire at some point in time—worth $127,771,376. This represented a staggering 88% of the company's total assets at the time of approximately $144 million.

35. Like Gumrukcu's credentials, this valuation was fabricated. For one thing, Enochian Biopharma had incurred just $265,000 of research and development expenses related to ENO-1001, but because it was acquired from a third party, as happened here in the form of DanDrit's acquisition of Enochian Biopharma, the Company could account for it under ASC 805 – Business Combinations as assets at "fair value" on the acquirer's balance sheet, instead of recording the research costs as research and development expenses. In other words, by engineering the transaction as they did, Defendants were able to record far more value associated with the drug license than it was actually worth.

36. Moreover, the Company used the firm of Noble Capital Markets ("Noble") to value the supposed HIV cure, but Noble's valuation report, obtained and reviewed in Lead Counsel's investigation, contains several fatal flaws, including that it (i) failed to conduct any diligence into the person responsible for the research, which would have uncovered Gumrukcu's false credentials and impacted the valuation; (ii) assumed that Enochian's HIV cure would be cleared for

commercialization, including obtaining FDA approval, in 2023 and would cost just $45 million to get to market, even though industry publications state, on average, eight years is required to bring a new HIV drug to market and the Congressional Budget Office and industry guides state that the cost to develop a new drug is, on average, nearly a $1 billion, and sometimes as much as $2 billion; and (iii) failed to account for the suspicious timing, namely that while Sindlev claimed that "[f]rom April to the end of May [2017]," he was informed that Gumrukcu had developed a sterilizing cure against HIV, as of May 2017, Enochian Biopharma had not even been legally established, and Weird Science was a mere corporate infant, as Gumrukcu established it in March 2017.

37.    In short, Defendants engineered a scheme to create a public entity that they could tell investors was worth over a hundred million dollars despite having no viable product and no legitimate valuation methodology.  What's more, that value was erected entirely around an "inventor" who was not who the Company said he was.

### 2. Defendants Hid Gumrukcu's Falsified Credentials and Long History of Fraud

#### a.  Gumrukcu's Fraudulent Medical Career

38.    Gumrukcu began his career as a magician in Turkey with the stage name "Dr. No."  After building a reputation for bending spoons with his mind, Gumrukcu claimed he had magical healing powers.  Eventually, while still in Turkey, Gumrukcu held himself out as a doctor.

39.    According to a webpage on Enochian's website entitled, "Meet our Inventor and Co-Founder," Gumrukcu's resume included medical training at Dokuz Eylul University, First Moscow State Medical University, and the People's Friendship University of Russia (RUDN).  In actuality, Gumrukcu did not graduate with a degree in medicine from Dokuz Eylul University.  Nor was he awarded a

medical degree from First Moscow State Medical University. Contrary to Enochian's assertions, there are no PhDs, medical degrees, or equivalents in Gumrukcu's name from the People's Friendship University of Russia, or any other institution of higher learning. In total, Enochian claimed that Gumrukcu had at least three degrees. In truth, he had none.

40. Despite Gumrukcu's lack of medical knowledge or credentials, he nevertheless illegally provided purported medical care and treatments to patients, often resulting in their death. The first known instance of this occurred in Turkey in the early 2010s. Gumrukcu accepted $275,000 to treat a cancer patient who subsequently died. When a reviewing oncologist declared Gumrukcu's treatments to be entirely ineffective, a Turkish criminal court issued a bench warrant in relation to the medical fraud. Rather than submitting to the police and defending himself, Gumrukcu fled Turkey in 2013 and has not returned.

41. After fleeing Turkey, Gumrukcu continued to illegally administer medical treatments to patients in the United States. In Pennsylvania, a family paid Gumrukcu over $300,000 to treat a child who was battling cancer. Gumrukcu's therapeutic regimen included shots of B-17 (a substance banned by the FDA due to concerns over cyanide poisoning) and mistletoe. These treatments once again proved ineffective, and the child died. Even though the child died of cancer before Gumrukcu finished administering treatment, Gumrukcu refused to return the initial $300,000 payment until a court awarded the family a judgment of $253,000 in 2015. Gumrukcu also treated at least four other patients with pseudoscientific methods, one of whom died.

### b. Fraudulent and Failed Business Endeavors

42. Outside of the medical context, Gumrukcu was involved in several fraudulent business ventures. One of Gumrukcu's first ventures was in the mining industry. In the 2000's, Gumrukcu became involved with and USD Mining Resources, two prospecting companies. He and the other executive officers

advocated for the use of dowsing, a discredited, ancient method of finding minerals using a fork stick and pendulum. The probability of finding minerals with dowsing techniques is no better than random chance. In this instance, the technique failed to turn up anything of value.

43.    In 2014, Gumrukcu founded Ermes LLC, a venture with the stated goal of investing in real estate. By impersonating various individuals, including a homeowner, lawyer, and escrow agent, and forging documents, including escrow and closing documents, Gumrukcu convinced Turkish businessman Ersin Akyuz to wire him $930,000 as an initial investment in the joint real estate venture. In his communications with Akyuz, Gumrukcu presented the prospect of purchasing and renovating a property in West Hollywood before flipping it for a profit. None of these transactions ever occurred. Gumrukcu never purchased, renovated, or sold the property. Instead, he forged documentation for Akyuz to make it seem as if he had. Gumrukcu simply kept the $930,000. Akyuz ultimately sued Gumrukcu, winning a $1.78 million judgment.

44.    In 2017, Gumrukcu pled no contest to one count of second-degree commercial burglary, paid $1.2 million in restitution, and spent time in a California jail. As part of his plea deal, Gumrukcu did not have to answer for 13 additional felony counts in the indictment, which included obtaining money, labor, or property by false pretenses, grand theft of personal property, false personation, identity theft, additional counts of second-degree commercial burglary, and passing a non-sufficient funds check (*i.e.*, bouncing a check).

### c. Gumrukcu's Commodities Scheme and the Murder of Gregory Davis

45.    According to the third superseding indictment in *United States v. Serhat Gumrukcu and Berek Eratay*, No. 5:22-cr-00058 (D.Vt.), contemporaneous with his prosecution and sham real estate endeavor, Gumrukcu founded Lauran Trading,

LLC and began to work with Gregory Davis, who operated Mode Commodities, LLC. One of Gumrukcu's first attempts to effectuate a deal was scuttled when Davis and another individual involved in the transaction determined that Gumrukcu had forged a bank letter documenting that Gumrukcu had access to €22.5 million in funds. Despite this red flag, Gumrukcu and Davis formed a partnership, Mode Lauran. In their respective positions, Gumrukcu was responsible for obtaining financing and Davis was responsible for executing oil commodities transactions. Gumrukcu allegedly presented numerous fraudulent bank account statements, wire confirmations, and checks, and posed as a variety of individuals in connection with fake financing transactions but was never able to secure financing.

46. As a result of the Mode Lauran scheme, Davis demanded that Gumrukcu's Lauran Trading buy Davis' Mode Commodities' share of the Mode Lauran partnership. Gumrukcu agreed, but never fully paid Davis or his company. When Davis approached Gumrukcu and threatened to expose Gumrukcu's conduct, Gumrukcu paid a hitman $150,000 to murder Davis. In January 2018, the hitman abducted Davis from his home, shot the father of six in the head and torso, and left him dead on the side of the road.

47. On May 25, 2022, Gumrukcu was arrested by federal authorities and charged with conspiracy to commit murder, unlawful seizure and detention, and wire fraud. In the indictment, the United States Government alleged that Gumrukcu's motive for the murder was to prevent Davis from derailing plans for Gumrukcu's biopharmaceutical company, Enochian Biopharma, to merge with DanDrit. At the time of this Amended Complaint, Gumrukcu is behind bars awaiting trial, which is scheduled to begin on October 7, 2024.

### 3. Enochian Failed to Reach Commercial Viability

48. Not surprisingly given Gumrukcu's false credentials and fraudulent past, Enochian ultimately failed to bring any products to market. The underlying technology that Enochian purchased from Gumrukcu was junk science and any

claimed progress that the company made was the result of fraudulent scientific data. As discussed in subsequent sections, after the fraud was exposed to the market, the Company wrote down the value of the purported intellectual property by $112 million. Despite having no commercially viable products, as detailed below, the Company funneled money to Gumrukcu, Wittekind, Sandler, Dybul, and others through backdoor agreements and stock sales.

49. As Enochian's inventor and co-founder, Gumrukcu told the public that he had developed a singular method for curing multiple diseases: Hijack RNA. According to Gumrukcu, Hijack RNA would trick viruses to use the proteins that they needed to reproduce to trigger cells to commit suicide—taking the virus down with them. Enochian declared that this approach was applicable to HBV and COVID, stating that the company had promising in vitro and in vivo study results, a completed Pre-IND FDA application, and a potential inhaled treatment.

50. However, Enochian's studies never progressed past the pre-clinical stage. Regardless, Enochian maintained that the value of its intellectual property was up to $150 million—climbing from the initial $127 million and never dipping below that claimed value from 2018 to 2022 despite significant delays. In the Company's SEC filings and investor presentations, Enochian routinely stated that the Company was working towards the next step in the development of its purported HIV cure, an investigational new drug ("IND") filing with the FDA.

51. In 2019, Enochian claimed that its goal was to meet with the FDA in an Initial Targeted Engagement for Regulatory Advice on CBER/CDER Products ("INTERACT") meeting for the HIV cure before the conclusion of the year. In 2020, Enochian had its INTERACT meeting and stated it would seek a Pre-IND submission in 2021. As time went on, Enochian stayed silent on the timing of an IND submission, until the middle of 2020 when the Company stated it would do a pre-IND submission, as opposed to a full IND submission, sometime in 2021. Within 18 months of the drug's acquisition, the Company's anticipated rate of

progress stalled.  Over time, the goalposts kept moving, with Enochian stating it hoped to submit the pre-IND submission by the end of 2021, early 2022, the latter part of 2022, and eventually removing from its filings altogether the language concerning submission timing.  In an October 2022 investor presentation, over four years after the merger, the Company indicated that the drug had moved backwards and was now considered a "proof of concept."

### 4. Defendants Funneled Tens of Millions of Dollars Outside the Company Throughout the Class Period

52.    Despite the lack of commercial viability, Enochian entered into numerous framework agreements, statements of work, and license agreements, the majority of which were with Gumrukcu's privately held corporate entities, such as G-Tech, and his 501(c)(3) non-profit medical research center, SRI.  G-Tech and SRI shared the same address.  G-Tech did not appear to have any website or active operations.  SRI charged hundreds of thousands of dollars to treat terminal cancer patients.  Enochian ultimately paid SRI and G-Tech over $20 million purportedly for consulting efforts, scientific research, and other services.  Subject to their many agreements, G-Tech and SRI would purportedly provide Enochian with services for the development of Enochian's HBV and SARS-CoV-2/influenza pipelines in 2020 and 2021.

53.    In addition to funneling over $20 million through G-Tech and SRI, the Company funneled money to Gumrukcu and Wittekind's real estate entity, SG & AW.  In December 2021, Enochian moved into a building owned by SG & AW and signed a ten-year lease pursuant to which the Company made regular rent payments to Wittekind.  The value of the lease was several million dollars paid directly to Wittekind.

54.    Through their roles and ownership in Weird Science, Wittekind and Sandler also received significant ownership shares in Enochian when the Company was formed.  Moreover, as the two managers of Weird Science, Wittekind and

Sandler controlled the entity that was a majority shareholder of Enochian.  And, in May of 2020, Weird Science sold more than 17 million shares of Enochian stock, receiving approximately $62 million.  Although the entire ownership structure of Weird Science is not clear on its face due to the entity being a privately held LLC, the record indicates that the Company was yet another way to funnel money to Gumrukcu, Wittekind, and Defendants.

55.    Defendants also used Weird Science to funnel money to Dybul. According to court documents, on October 28, 2020, Weird Science assigned 450,568 shares to Dybul in the form of a trust.  Based on the market price on the date of the transfer, those shares were valued at approximately $1.2 million.

56.    On April 15, 2022, just 40 days before Gumrukcu was arrested for the murder of Gregory Davis, Weird Science sold another 4,961,363 shares of Enochian stock, which on that date were worth at least $37 million.  According to the Form-4 filed for that transaction, the sale was a "[p]ro rata distribution to the members of Weird Science."  In addition, of the 4.9 million shares disposed of on that date, 992,273 were distributed to Sandler.  The value of those shares on that date was at least $7.5 million.

### 5.    Defendants Went to Great Lengths to Conceal Gumrukcu's Sordid History

57.    Throughout the Class Period, Defendants went to great lengths to conceal Gumrukcu's history of fraud and deceit.  For example, Enochian fired former CEO Leire after Leire voiced concerns that Gumrukcu was a fraud.  As *The Wall Street Journal* reported, Leire stated that he raised certain concerns related to a former scientific advisor of Enochian with Enochian's then Board of Directors, and that he was subsequently terminated by Enochian after raising such concerns.  Lead Counsel's investigation confirmed directly with Leire that his statements in *The Wall Street Journal* were accurate.

58.    Leire was not the only executive terminated for questioning Gumrukcu's credentials.  Enochian terminated former CFO Wolfe's employment as soon as he started asking questions about Gumrukcu.  In an affidavit submitted in connection with litigation between Enochian and Wolfe in Vermont, Wolfe testified that Leire "made clear to [him] that the termination was because [he] was continuing to raise concerns about" Gumrukcu who was "a convicted felon."

59.    The Company took the same aggressive approach when an investment research firm first questioned Gumrukcu's credentials.  White Diamond Research published its first in a series of three blog posts on Enochian on November 19, 2019.  The blog posts commented on Gumrukcu's criminal background, including his no contest plea to commercial burglary.  The post also noted White Diamond was unable to affirmatively confirm Gumrukcu had any advanced degree, licensing, or publications.

60.    Enochian issued at least two statements directly contradicting White Diamond's reports.  In both statements, Enochian stood by Gumrukcu and continued to refer to him as a doctor.  Enochian's November 25, 2019, press release quoted the "widely respected and well-published collaborating scientist, Dr. Philippe Gallay, PhD" as stating "[t]he mechanism of action conceived by the brilliant scientist, Dr. Gumrukcu, is remarkably innovative.  The data generated thus far have exceeded my expectations."  The press release went on to describe Enochian's progress in glowing terms.

61.    The November 25, 2019, press release also provided a detailed profile of Gumrukcu, highlighting his purported credentials:

> After receiving his preclinical training at the Dokuz Eylul University in 2004, Dr. Serhat Gumrukcu continued his training in various institutions and started working as a physician licensed by the Ministry of Health of Turkey in 2008. Later, after working under Dr. Suat Arusan in Turkey, Dr. Gumrukcu decided to explore further studies in the field of cell and gene therapies. He is currently the director of Seraph Research Institute, a non-profit organization where he runs a research

lab at the cutting edge of cell, gene and immunotherapy research. On agreeing to join the Institute's scientific board, one of the world's leading experts and his mentor in immuno-oncology Prof. Shimon Slavin said, "Dr. Gumrukcu was a young Turkish post-doc with interesting ideas when I first met him eight years ago. I am looking forward to our future collaboration in developing and implementing novel cancer treatments at Seraph Research Institute."

His interest in other fields of science, such as physics, has led him to pursue creating cross-disciplinary solutions to complex human diseases as a researcher. Based on his unique research training, Dr. Gumrukcu has become a prolific inventor, submitting various patent/provisional patent applications, which include several approaches aimed to treat or potentially cure HIV/AIDS, Hepatitis B, major solid tumors, rare but deadly diseases, and for a novel vaccine for HIV among many others.

Dr. Gumrukcu has licensed intellectual property related to HIV and several solid tumors to Enochian. Dr. Mark Dybul, MD said, "Dr. Gumrukcu is one of those rare geniuses that is not bound by scientific discipline or dogma. He sees connections and opportunities often missed. His ideas are the purest kind: those that seem so obvious and simple once he has conceived of, and explained them."

62.     On June 6, 2022, Danish news outlet *Okonomisk Ugebrev* published an article quoting a letter to shareholders from Sindlev, in which Sindlev wrote, "For some time we have been exposed to Shorter's manipulative, lying and incorrect distorted information about Enochian and the company's researcher Dr. Serhat – solely with the aim of making the share price fall . . . . We started by going to court with them via our lawyers – it didn't help."

63.     In addition to blog posts, Danish news outlet *MedWatch* began serially publishing its observations of Enochian in 2020. In an article published on January 24, 2020, an interviewer is quoted as having asked Enochian's CEO Dybul about Gumrukcu's lack of research and civil lawsuits. Dybul affirmed the founder's aptitude for science, reiterating that Gumrukcu had the necessary qualifications before comparing him to Bill Gates and Albert Einstein. Dybul minimized the importance of research as "mean[ing] something in certain spheres, but does not mean anything to people in other spheres."

64.    *MedWatch* continued to question Gumrukcu's dangerous therapeutic regimes, lack of published research, and history as a defendant in multiple litigations.    *MedWatch* also noted that Enochian claimed to have reviewed documentation proving Gumrukcu's educational background as part of the due diligence process and that the criminal charge of commercial burglary was simply a case of Gumrukcu wiring a bad check.    *MedWatch* quoted Sindlev saying: "My view of Enochian has not changed.    I met Gumrukcu in 2016 and I invested because of Serhat's brilliant ideas about cell, gene and immunotherapy.    I would characterize my investment as hyper-exciting with the potential to use cutting-edge science to save and transform many lives."

65.    In March of 2020, *MedWatch* reported that it had spoken with American government agencies that confirmed Gumrukcu's lack of medical licensing in the United States.    However, it noted that Enochian had previously addressed such concerns by stating that Gumrukcu received his licenses outside of the United States and otherwise supervised, as opposed to administered, treatment.

66.    On or around May 18, 2020, Enochian edited the text of Gumrukcu's profile.    The revised profile was substantially similar to the November 25, 2019, profile, and stated:

"Dr. Gumrukcu commenced his medical studies at Dokuz Eylul University, Turkey (2004) and received his medical degree (2006) at First Moscow State University, where he also completed his first residency in medical genetics in 2008 before continuing his clinical research studies in Turkey.    He holds a PhD degree from RUDN University, and he is currently the director of Seraph Research Institute, a non-profit organization he established in Los Angeles, California, where he also runs a research lab.    In his initial years of research, he studied gene expression profile changes in stem cells during embryonic and fetal development.    In later years, he shifted his focus to gene and cell therapies, particularly in the context of cancer and HIV, creating new adoptive cell therapy models for chronic infectious diseases and solid tumor cancers.    One of his objectives was to develop a better autologous gene-modified stem cell transplant model to achieve

AMENDED CLASS ACTION COMPLAINT                                              8:22-cv-01374-JWH-JDE

23

successful engraftment without the necessity of myeloablative conditioning regimens. Apart from his continuing research on solid tumor cancers, his current research focuses on creating new approaches and mechanisms of actions in antiviral therapies through co-opting virus-specific components of viral replication machinery, on viruses including HBV, influenza, Ebola and HIV. His most recent studies are opening up an uncharted field in molecular virology and antiviral research with potential clinical implications in pursuit of cures for chronic viral infections."

67.     Sindlev was effusive in his admiration for Gumrukcu. *Okonomisk Ugebrev* reported that Sindlev at one point stated, "[o]ur researcher and inventor is the biotech world's answer to Zuckerberg, Bill Gates, and Larry Page. People close to him compare him to Leonardo Da Vinci, Nikola Tesla, and Einstein in one and the same person. We will provide data on exciting science over the next 4-12 months."

68.     On January 22, 2022, Dybul repeated his praise for Gumrukcu in a letter to Enochian shareholders, referring to Gumrukcu as a doctor while noting that the biotechnology industry is "too often constrained by traditional diplomas, methodologies, and dogmas." This subtle nod to the truth danced around lingering questions concerning Gumrukcu while the entirety of the letter made clear that Enochian would stand by its co-founder and scientific inventor.

### 6.     Hindenburg Research and *The Wall Street Journal* Revealed the Full Truth in June 2022

69.     On May 25, 2022, the United States Department of Justice announced that federal authorities had arrested Gumrukcu on charges of murder. On news of the indictment, the stock fell from a share price of $5.87 to $3.70.

70.     On that same day, the Company issued a Form 8-K attaching a press release in which the Board distanced itself from Gumrukcu but vigorously and unequivocally defended the underlying science and "affirm[ed] its confidence in the

AMENDED CLASS ACTION COMPLAINT                                          8:22-cv-01374-JWH-JDE

24

Company's promising future." After this release, by May 31, 2022, the Company's stock rose to $5.26.

71.    The next day, on June 1, 2022, Hindenburg Research published a comprehensive report revealing Gumrukcu's lack of credentials, past frauds, and the inaccuracy of many of Defendants' public statements.

72.    Hindenburg's detailed 40-page report included interviews with key people at Enochian, including Sindlev, Dybul, and Brosgart. Hindenburg also spoke with Dr. Peter Piot, who Sindlev claimed had validated Gumrukcu's science. But Piot told Hindenburg, "I have never validated anything, and they should not use my name." Further, Hindenburg cited legal documents, including Gumrukcu's murder indictment and a screenshot of the letter purportedly written to the Turkish Criminal Court on behalf of Gumrukcu by Dybul. Hindenburg's founder, Nate Anderson, was able to obtain a fake medical degree from Moscow State with exactly the same date, field of study, and official seal as Gumrukcu's purported degree. Hindenburg narrated screenshots of Gumrukcu's social media account and magic performances. Hindenburg's associates even went to Turkey to watch "grainy DVD recordings of Gumrukcu's local performances that [his magic mentor] found in a dusty cardboard box in the backroom of a magic shop."

73.    Hindenburg's thoroughly researched report presented Gumrukcu as without credibility and Sindlev as reckless. They engaged in financial accounting shenanigans, but no credible research efforts, all the while boasting of their success. Gumrukcu used the money to fund a lavish lifestyle, complete with private planes and trips to Burning Man. Sindlev was able to boast to his wealthy friends that his next billion-dollar business venture would cure cancer and make a 4x return on the shares that he sold them.

74.    Hindenburg stated in no uncertain terms that Gumrukcu was not a doctor and that Gumrukcu had illegally provided treatment to at least three patients who died. Hindenburg enumerated the many times Defendants lied about the

AMENDED CLASS ACTION COMPLAINT                                    8:22-cv-01374-JWH-JDE

25

viability of the Company's drug pipelines and outlined the total lack of progress in research and development. Hindenburg also made clear that none of Gumrukcu's actions at Enochian would be possible without Sindlev.

75. Hindenburg's interview with Sindlev is particularly damning. In his interview with Hindenburg, Sindlev was "unphased" when approached about Gumrukcu, admitting that he knew about Gumrukcu's felony conviction, but did not disclose it to investors because the court records were purportedly public. Sindlev also told Hindenburg, "To be honest, I don't care whether he's guilty or not." As for Gumrukcu's academic pedigree, Sindlev had at one point stated that both he personally and Enochian as a company had verified Gumrukcu's credentials as part of the due diligence process, only to backtrack when speaking to Hindenburg and admit that he relied on others to validate Gumrukcu's credentials and expertise.

76. In response to the Hindenburg Report, the Company published a statement attached to its June 2, 2022, Form 8-K again distancing itself from Gumrukcu but denying Hindenburg's allegations about the valueless nature of Enochian's drug pipeline.

77. The revelations continued. On June 27, 2022, *The Wall Street Journal* disclosed new damning information that was not revealed in the Hindenburg Report. Specifically, *The Wall Street Journal* revealed that Leire, Enochian's former CEO, said "he began to suspect that Mr. Gumrukcu had fabricated his resume and held neither a medical degree nor a doctoral degree." The article further reported that Leire said he was fired in 2019 after raising his concerns with the Enochian Board, quoting him as saying "I thought the guy was a liar. Maybe just, you know, taking liberty with science."

### 7. Enochian Recorded Massive Impairment and Wrote Down the Value of the Intellectual Property Acquired from Gumrukcu

78. After initially denying negative statements about Gumrukcu's "science," the Company ultimately had no choice but to admit that it had materially

overvalued the license to Gumrukcu's intellectual property. This admission came in the form of an impairment that the Company recorded for Enochian's fiscal year ending June 30, 2022.

79.    Since at least May 2018, Enochian had recorded the value of Gumrukcu's license as a Definite Life Intangible Asset, explaining in its May 2018 Form 10-Q that "[d]uring February 2018, the Company acquired a License Agreement to the HIV therapy ("ENO-1001") which consists of a perpetual, fully paid-up, royalty-free, sublicensable, and sole and exclusive worldwide license to research, develop, use, sell, have sold, make, have made, offer for sale, import and otherwise commercialize certain intellectual property in cellular therapies for the prevention, treatment, amelioration of and/or therapy exclusively for HIV in humans, and research and development exclusively relating to HIV in humans." In its May 15, 2018, Form 10-Q, Enochian claimed the intellectual property it acquired from Gumrukcu was worth $127,771,376. In subsequent filings, the claimed value of the Company's intellectual property fluctuated between $152 million and $154 million.

80.    Even after Gumrukcu's arrest, the Company still claimed that the intellectual property he sold to Enochian had value. In a May 25, 2022, press release, the Enochian Board of Directors stated that despite his arrest, the Board "expressed unanimous and strong affirmation of the current position of the Company, the Management and the promising advancement of the Research and Development pipeline." Dybul went one step further, stating that "[t]he profound potential of the scientific ideas, and the promising pre-clinical and in certain cases clinical data have not changed. We are fully committed to advancing, and in fact, accelerating, the development of potential commercial products that could potentially save and lift-up many millions of lives. The personal life of the inventor and co-founder does not alter those fundamental facts. Indeed, there has never been a formal role for Dr.

AMENDED CLASS ACTION COMPLAINT                                            8:22-cv-01374-JWH-JDE

Gumrukcu in the Company and his remaining informal role as a scientific advisor has concluded. We look forward to the work ahead."

81.    But following the revelations by Hindenburg that Gumrukcu was not a doctor, held no degrees, and was a serial fraudster in addition to being indicted for murder, coupled with the revelation from *The Wall Street Journal* that the Board of Directors knew these facts prior to their disclosure, the Company finally wrote down the assets.  On February 27, 2023, Enochian filed a 10-K in which it reported an impairment loss on Gumrukcu's intellectual property of $93,253,000 for the year ended June 30, 2022.  On October 2, 2023, Enochian filed a 10-K in which it reported an additional impairment of $18,960,000 for the year ended June 30, 2023.

### 8.    Defendants' Conduct Led to Numerous Related Litigations

82.    Enochian's involvement with Gumrukcu and the revelation of Defendants' fraud has resulted in a litany of litigation.

### a.    Cross Suits Between Enochian and Former CFO Robert Wolfe

83.    Since December 2018, former CEO Robert Wolfe and Enochian have been involved in a number of lawsuits stemming from Wolfe's termination for raising concerns about Gumrukcu.

84.    According to an affidavit submitted by Wolfe in Vermont state court, he began serving as Enochian's CFO in June 2017.  Shortly thereafter, he said he became aware that Enochian was spending what he considered "significant sums" on retaining companies affiliated with Gumrukcu.  He further became aware that Gumrukcu had a criminal past and was "unwilling to stop expressing [his] concerns about the company's association with a convicted felon."  His affidavit states that he was then terminated on December 13, 2018, and told that he was terminated because he was continuing to raise concerns about Gumrukcu.  After failing to negotiate a resolution with Enochian, Wolfe filed a complaint in a Danish court on February 7, 2019.

85. On February 12, 2019, Enochian filed suit in Vermont state court alleging that Wolfe had disclosed damaging confidential information in the Danish litigation and that Enochian was at risk for irreparable harm. According to court records, Enochian claimed that public disclosure of the information reflected in the Danish complaint threatened to impact investors' views of Enochian because the payments could raise concerns among investors that any investment in Enochian may not be sound. Court records further explain that Enochian's specific concern was that investors could learn of Gumrukcu's criminal convictions, which could cast doubt on the Company's transactions with him. There was also a concern that Wolfe's disclosure of the information prevented Enochian from controlling how the information could be spun to the public.

86. The Vermont court initially granted plaintiffs' requested temporary restraining order ("TRO") and denied defendants' motion to dismiss. When plaintiffs failed to satisfy the requirements for a preliminary injunction, the court dissolved the TRO, holding that Wolfe was under "no express confidentiality agreement as to the U.S. company." On November 17, 2020, the court issued a dismissal order which said, among other things, "to the extent [Wolfe] might later pursue a malicious prosecution action, the dismissal with prejudice order adjudicates the merits in [Wolfe's] favor."

87. Wolfe then filed a malicious prosecution suit in Vermont federal court on March 1, 2021. On August 24, 2023, the court denied defendants' motion for summary judgment because "[a] genuine dispute of material fact exists regarding whether the Underlying Action lacked probable cause when filed." On December 4, 2023, the court denied defendants' motion for reconsideration because "[d]efendants do not 'present any new facts or controlling law that the court overlooked that might reasonably be expected to alter the court's decision and order."

### b. Enochian v. Leire

88.    On August 31, 2022, Enochian sued its former CEO Leire for defamation.  Enochian stated that Leire made "false and disparaging statements about Enochian that were published in the Wall Street Journal" including that "[Leire] raised certain concerns related to a former scientific advisor of Enochian with Enochian's then Board of Directors (the 'Enochian Board'), and that he was subsequently terminated by Enochian after raising such concerns."  On February 1, 2023, Enochian voluntarily dismissed its action, indicating that the parties had settled their dispute out of court.

### c. Enochian v. Gumrukcu

89.    To deflect blame for Defendants' securities fraud, on October 21, 2022, Enochian filed suit against Gumrukcu, Wittekind, and affiliated entities.  Enochian alleged that these individuals and entities had engaged in a concerted, deliberate scheme to alter, falsify, and misrepresent to Enochian the results of multiple studies supporting its HBV and SARS-CoV-2/influenza pipelines.  Enochian's complaint included counts for breach of contract, breach of implied covenant of good faith and fair dealing, intentional misrepresentation, fraudulent concealment, fraudulent nondisclosure, negligent misrepresentation, civil conspiracy, unjust enrichment, and unfair business practices.  But Enochian's complaint does not, and cannot, relieve Defendants from liability for issuing false or misleading statements and omitting material facts that they knew or had a duty to know.

90.    In its complaint, Enochian admitted that Gumrukcu's credentials—the same credentials Enochian conveyed to investors in its public statements—were "misrepresentations."  Enochian also admitted to paying Gumrukcu, Wittekind, and their affiliated entities, as well as other third parties more than $25 million.  The court scheduled a jury trial for March 3, 2025.

**B.     False and Misleading Statements and Omissions**

91.     Enochian consistently referred to Gumrukcu as a doctor in SEC filings, on the Company's website, and in various communications to investors.

92.     The false and misleading statements in Enochian's SEC filings are set forth in the following table:

| Filing(s) | False and Misleading Statement(s) |
|---|---|
| January 17, 2018, Form 8-K | "The parties agree to discuss in good faith entering into arrangements providing for a license-back of all technology and intellectual property to Dr. Gumrukcu for therapeutic purposes in his private practice." |
| February 11, 2019, Form 8-K; March 7, 2019, Form 8-K; May 1, 2019, Form 8-K | "Serhat Gumrukcu, MD, PhD, Inventor" is listed as a member of Enochian's Management Team |
| November 25, 2019, Form 8-K | "An abstract accepted for presentation at the HepDART meeting featuring *in vivo* and *in vitro* data from preclinical studies conducted with this novel HBV treatment candidate will be presented by Dr. Serhat Gumrukcu, MD, PhD" |
| December 10, 2019, Form 8-K | "Dr. Serhat Gumrukcu, the inventor of products in the Enochian pipeline" |
| July 13, 2020, Form S-3; July 16, 2020, Form S-3A; July 20, 2020, Form 424B5; September 23, 2020, Form 10-K; June, 16, 2021, Form 424B5; September 24, 2021, Form 10-K | "Many of the techniques utilized in the development of our product candidates have been developed by Dr. Serhat Gumrukcu, and we rely on the services of Dr. Gumrukcu…Our future performance will depend on our ability to retain the services of Dr. Gumrukcu, G-Tech Bio LLC and Seraph Research Institute.  The loss of the services of any of the foregoing…could impede the achievement of our research, |

| | |
|---|---|
| | development, regulatory approvals and commercialization objectives." |
| September 24, 2021, Form 10-K | "Our dependence on the services of experts, including Dr. Serhat Gumrukcu" "Our co-founder and inventor, Dr. Serhat Gumrukcu" |
| January 27, 2022, Form 14-A; February 3, 2021, Form 14-A; October 28, 2021, Form 10-K/A; | "G-Tech is controlled by Dr. Serhat Gumrukcu" |
| November 15, 2021, Form 10-Q; February 14, 2022, Form 10-Q; May 13, 2022, Form 10-Q | "G-Tech is controlled by Dr. Serhat Gumrukcu" "Our co-founder and inventor, Dr. Serhat Gumrukcu" |
| December 1, 2021, Form 8-K | "Serhat Gumrukcu, MD PhD" |
| January 24, 2022, Form 8-K | "[T]the ideas behind Enochian Biosciences" [sic] pipeline come from the inventor, Dr. Serhat Gumrukcu" |
| February 11, 2022, Form S-3; March 3, 2022, Form S-3A | "Our co-founder and inventor, Dr. Serhat Gumrukcu" |
| March 15, 2022, Form 8-K | "Our Co-Founder and Inventor, Dr. Serhat Gumrukcu has presented data at scientific meetings" |
| April 5, 2022, Form 8-K | "Enochian Biosciences . . . announced that Dr. Serhat Gumrukcu, the Inventor and Co-Founder of the Company, deliver the concluding Plenary Lecture" |
| May 25, 2022, Form 8-K | "The Board learned of the Arrest [sic] of Dr. Serhat Gumrukcu" "The board reviewed the important scientific discoveries of the inventor, the Company's rights with regards to those discoveries – that will not change, the |

AMENDED CLASS ACTION COMPLAINT                                    8:22-cv-01374-JWH-JDE

32

|  | fact that Dr. Serhat Gumrukcu has had no formal role in the Company" |
|---|---|

93. On March 1, 2019, Enochian issued its March 2019 Form 8-K, which stated that "Enochian . . . today has posted a video on its website . . . introducing some of its team members and describing its mission and business." The filing included a link to Enochian's website where investors could view the referenced video.[1] In the video, Chairman Sindlev introduces investors to Enochian's "team members." Gumrukcu is introduced first and described by CEO Dybul as:

> Enochian's inventor, Dr. Serhat has the type of brilliance that has the capacity to see across disciplines in science and connect things that others don't see. And that's exactly what he's done to create the most innovative approaches to HIV and oncology that I know of.

94. Enochian's management team page contained the following excerpt in a biography of Gumrukcu: "Dr. Serhat Gumrukcu has been at the forefront of cell, gene and immunotherapy for more than a decade. After his medical training at Dokuz Eylul University (2004) and Istanbul Marmara University (2006), he continued his clinical training and practice in different centers around Europe including University of Edinburgh United Kingdom, Pierre & Marie Curie University Saint Antoine Teaching Hospital, France and Institute of Bioregulation St Petersburg, Russia."

95. On November 25, 2019, Enochian posted on its website a biography page dedicated to Gumrukcu titled "Meet Our Inventor & Co-Founder", which identified Gumrukcu as a Doctor with a degree from Dokuz Eylul University and license from Turkey's Ministry of Health, thus mirroring the biography published in the November 2019 Press Release and November 2019 Form 8-K.

---

[1] Although Enochian has since taken this video down from their YouTube channel, Hindenburg Research was able to retrieve the video and post it to Hindenburg's own YouTube channel. The video can be found here: https://www.youtube.com/watch?v=rvf-UDfF_pw

96.    On or around May 18, 2020, Enochian edited the text of Gumrukcu's biography on the Company's website.  The revised profile was substantially similar to the November 25, 2019, profile, but expanded Gumrukcu's academic achievements to include a medical degree from First Moscow State University and a PhD degree from RUDN University.

97.    In Enochian's November 25, 2019, press release, Dybul is quoted saying "Dr. Gumrukcu is one of those rare geniuses that is not bound by scientific discipline or dogma.  He sees connections and opportunities often missed.  His ideas are the purest kind: those that seem so obvious and simple once he has conceived of, and explained them."

98.    In a January 24, 2020, public interview, Dybul acknowledged that the interviewer posed a "reasonable question" with regards to Gumrukcu's lack of published medical research but affirmed the founder's aptitude for science.  Dybul reiterated that Gumrukcu had the necessary qualifications before comparing him to Bill Gates and Albert Einstein.

99.    *MedWatch* reported in a January 27, 2020, article that When approached by a journalist about Gumrukcu's criminal charges, Sindlev stated: "My view of Enochian has not changed.  I met Gumrukcu in 2016 and I invested because of Serhat's brilliant ideas about cell, gene and immunotherapy.  I would characterize my investment as hyper-exciting with the potential to use cutting-edge science to save and transform many lives."

100.   The statements in ¶¶90–97 were materially false and misleading when made because Gumrukcu was not a doctor and did not have either a medical degree or a PhD degree.  In *Enochian Biosciences, Inc v. Serhat Gumrukcu et al.*, Case No. 22STCV34071 (Cal. Sup. Ct.), Enochian admitted to the falsity of these statements. In the Company's Amended Complaint in that action, Enochian characterized statements regarding Gumrukcu's credentials included in Gumrukcu's biography on the SRI website and other places as "misrepresentations."

101. But Gumrukcu's biography on the SRI website contained the same content as Defendants public statements as noted above. Specifically, that Gumrukcu "commenced his medical training at Dokuz Eylul University" and "received his medical degree [at] First Moscow State Medical University."

102. Defendants' admissions are corroborated by the extensively sourced allegations in the Hindenburg Report. These allegations are acknowledged in Enochian's amended complaint, which says that "since Gumrukcu's arrest in May 2022 for arranging the murder of Gregory Davis, media outlets have reported that Gumrukcu falsified and misrepresented his medical degrees and credentials to Enochian and the public."

103. Enochian's published biography of, and glowing statements about, Gumrukcu created the materially false and misleading impression that Enochian's cures were created, overseen, and developed by a qualified individual with a credible understanding of medicine. As demonstrated by Gumrukcu's complete lack of credentials, Gumrukcu did not have the proper training to carry out or oversee complex medical research.

104. In addition, the Company's statements are false and misleading by omission. In choosing to speak about Gumrukcu's purported qualifications and failing to disclose certain existing, material negative facts, Defendants' statements omitted material facts necessary to make the statements not misleading in the context in which they were made.

105. These omissions included:

a.    Defendants omitted to state that Gumrukcu was not a doctor.

b.    Defendants omitted to state that Gumrukcu did not have a medical degree.

c.    Defendants omitted to state that Gumrukcu did not have a PhD degree.

AMENDED CLASS ACTION COMPLAINT

8:22-cv-01374-JWH-JDE

35

d.  Defendants omitted to state that they did either no or inadequate due diligence into Gumrukcu's academic and professional qualifications.

e.  Defendants omitted to state that Company officers, namely Wolfe and Leire, reported concerns about Gumrukcu's resume, qualifications, and abilities.

f.  Defendants omitted to state that the Company made no inquiry into concerns reported by Company officers.

g.  Defendants omitted to state that the Company retaliated against Company officers who reported concerns about Gumrukcu, namely the terminations of Wolfe and Leire.

h.  Defendants omitted to state that Gumrukcu had a criminal record related to fraud.

i.  Defendants omitted to state that Gumrukcu was a fugitive in Turkey.

j.  Defendants omitted to state that Gumrukcu's treatments had proven ineffective in the case of at least two patients who subsequently died.

k.  Defendants omitted to state that they did either no or inadequate due diligence into Gumrukcu's research.

l.  Defendants omitted to state that they did either no or inadequate due diligence into Gumrukcu's studies and the results of those studies.

C.  **Summary of Scienter Allegations**

1.  **Defendants Were Intimately Involved in Promoting Gumrukcu and His Purported Intellectual Property, Which Was the Sole Basis of Enochian's Value**

106.  Defendants made false and misleading statements and omitted material information concerning Gumrukcu's credentials and qualifications, his past frauds, and the valueless nature of the intellectual property he brought to the Company. These statements were central to Enochian's business based on the complete and

total reliance Defendants placed on Gumrukcu and his purported scientific discoveries as described above.

107. Indeed, the Company's founding documents described Gumrukcu as the "sole inventor of all Company IP rights and Company Technology . . . ." Further, when the Company was founded in 2018, the intellectual property Gumrukcu sold to Enochian was valued in Enochian's May 15, 2018, Form 10-Q at $127 million, which was 88% of the Company's total assets. That remained relatively unchanged up to the exposure of the fraud, with the assets valued at $154,824,000 in Enochian's May 13, 2022, Form 10-Q, which was 86% of the Company's total assets at that time. Enochian failed to develop any intellectual property beyond the rights that Gumrukcu brought to the Company. In view of the singular significance Gumrukcu had to the Company, there was nothing more central to the Company's business than his credentials and scientific abilities.

108. Even Gumrukcu's compensation was structured in a way to evade NASDAQ regulations creating a strong inference that Defendants knew of his criminal past. Throughout the Class Period, the Company and its officers made repeated representations about Gumrukcu's indispensability to Enochian. Indeed, the Company's founding documents described Gumrukcu as the "sole inventor of all Company IP rights and Company Technology . . . ." Further, several of the Officer Defendants including Sindlev and Dybul repeatedly held out Gumrukcu as a reputed doctor who co-founded Enochian and led the Company's scientific efforts as its "Inventor." Nevertheless, Gumrukcu remained off the Company's payroll and, by the Company's own admission, never held an official position. Instead, the Company and its executives developed an elaborate payment scheme to funnel money to Gumrukcu specifically to evade regulations prohibiting payments or employment of persons with criminal convictions.

109. As explained above, one method Enochian used to funnel money to Gumrukcu was payments made to G-Tech, a company wholly owned by Gumrukcu,

for what the Company claimed was personal security services for Gumrukcu himself. Those payments, as well as the ones to SRI, totaled more than $20 million each year.

110. Wolfe alleged that the payment structure was implemented to avoid suspicion of wrongdoing and to circumvent securities regulations restricting the involvement of convicted felons in securities offerings, including but not limited to Section 926 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

111. Based on these facts, there is a strong inference of scienter that Defendants knew or were reckless in not knowing that (i) Gumrukcu was not a medical doctor and held no degrees from any institute of higher education; (ii) Gumrukcu had an extensive history of prior fraudulent activity and criminal convictions; and (iii) the science that Gumrukcu purportedly developed was a sham and valueless.

## 2. Company Executives Raised Red Flags About Gumrukcu's Past, but Defendants Silenced Them

112. Numerous corporate insiders raised concerns about Gumrukcu's past but, instead of triggering due diligence or even superficial inquiries, these concerns were silenced and punished by the Defendants. Additionally, at least one Defendant explicitly told news outlets and market researchers that they were aware of information previously undisclosed to investors.

113. When former CEO Robert Wolfe raised the suspicious nature of the Company's payments to Gumrukcu, he was terminated. After Wolfe's termination, he sued Enochian for unpaid wages in Danish court. Enochian responded by suing Wolfe in Vermont court alleging that Wolfe had released the Company's confidential information in his original Danish court filing. In an affidavit filed in the litigation between Enochian and Wolfe in Vermont, Wolfe testified that it was

made clear to him that "the termination was because I was continuing to raise concerns about" Gumrukcu who was "a convicted felon."

114. Former CEO Leire raised concerns as well. Specifically, Leire stated he began to suspect that Gumrukcu had fabricated his resume and held neither a medical degree nor a doctoral degree, as early as 2019. According to statements he made to *The Wall Street Journal,* Leire claimed he "thought [Gumrukcu] was a liar" and was "taking liberty with science." Similar to what happened to Wolfe, when Leire raised his concerns to Enochian's Board of Directors, he, too, was terminated. Lead Counsel's investigation has independently verified Leire's statements quoted in *The Wall Street Journal*.

115. Finally, after the truth emerged, Defendant Sindlev, the Chairman of Enochian's Board of Directors, explicitly admitted he and others at Enochian knew of Gumrukcu's fraudulent past but did not disclose it to investors. After Sindlev was asked whether he knew Gumrukcu had been charged with several felonies related to fraud before the merger, he responded "We did." Further, Sindlev stated they never disclosed these convictions to investors because "court records are public."

### 3. Defendants Were Motivated to Defraud Investors for Personal Gain

116. As explained above, the inflated value of the Company was used to enrich Defendants Dybul and Sandler, who benefited directly from insider sales of Weird Science, an entity in which both had an interest. As noted above, in May of 2020, Weird Science sold more than 17 million shares of Enochian stock, receiving approximately $62 million. In addition, on April 15, 2022, just 40 days before Gumrukcu was arrested for the murder of Gregory Davis, Weird Science sold another 4,961,363 shares of Enochian stock, which on that date were worth at least $37 million. By that time, Weird Science had assigned 450,568 shares to Dybul in the form of a trust. And, as part of the April 15, 2022, sale Sandler received 992,273

shares, which at the time were worth at least $7.5 million. Due to Weird Science's organization as a privately held LLC, without discovery, it is unclear who else may have profited from these sales.

### 4. In the Alternative, Defendants Acted with Deliberate Recklessness in Disregarding Gumrukcu's Falsified Credentials and Fraudulent Past

117. Even if Defendants did not know the statements set forth above were false or misleading, Defendants acted with deliberate recklessness in disregarding the facts that the Hindenburg Report and *The Wall Street Journal* article exposed. Indeed, although Sindlev claimed that the Company had conducted "a very thorough investigation" into Gumrukcu's credentials, he also admitted that all of the information they had received came from Gumrukcu or Gumrukcu's lawyer. And although Defendant Sindlev claimed to have seen Gumrukcu's diplomas from Turkey and Russia, Hindenburg was able to show these documents were forgeries. Defendants thus either did not conduct a "thorough due diligence" as claimed, or their diligence uncovered evidence of Gumrukcu's deceit, but it was covered up. Either way, in the face of the red flags surrounding Gumrukcu, his importance to the Company, and the millions of dollars they were paying for his scientific research, Defendants were at minimum deliberately reckless.

### 5. Corporate Scienter

118. As alleged above, Defendants Sindlev and Dybulall of whom acted with scienter, had actual and apparent authority over Enochian and acted within the scope of their apparent authority in making the misstatements and omissions at issue. Their scienter is imputed to the Company.

## V. LOSS CAUSATION

119. Defendants' fraudulent conduct directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses as a result of purchasing or

otherwise acquiring Enochian common stock at artificially inflated prices during the Class Period.

120. Defendants, through their materially false and misleading statements and omissions set forth above, concealed Gumrukcu's lack of medical qualifications and falsified degrees and credentials, Gumrukcu's extensive fraudulent and criminal past, and the valueless nature of the intellectual property that Gumrukcu brought to the Company. By concealing these facts, Defendants also concealed the numerous risks associated with their false and misleading statements and omissions, including that Enochian may be incapable of reaching profitability.

**A.    The Hindenburg Report Revealed Defendants' Misstatements**

121. Defendants' statements were first revealed to be false in an investigative report published by Hindenburg Research on June 1, 2022. The Hindenburg Report was the result of due diligence into Gumrukcu's background, a review of sealed and foreign court proceedings, and interviews with Enochian employees, executives, and board members.

122. The Hindenburg Report directly highlighted Defendants' false and misleading statements. By referencing statements made by Defendants throughout the Class Period and contrasting them with reports from people associated with Enochian and Hindenburg's own independent investigation, the Hindenburg Report exposed that Defendants had made materially false and misleading statements about Gumrukcu's credentials and past throughout the Class Period.

123. Specifically, the Hindenburg Report revealed, among other things, that:

a.    Gumrukcu held no medical degrees, or any other advanced degrees, and was not licensed to practice medicine in any foreign or domestic jurisdiction;

b.    Gumrukcu had a long history of past fraudulent activity including real estate and medical fraud;

c.    Gumrukcu was prosecuted and convicted for some of these many fraudulent schemes; and

d.    The Company's entire research pipeline was developed by and hinged on the efforts of a serial fraudster, convicted felon, and fake doctor.

124.    As a result of Defendants' misstatements exposed in the Hindenburg Report, Enochian's share price declined catastrophically.  Specifically, the stock lost 29% of its value on a single day on June 1, 2022.

**B.    The Wall Street Journal Publishes Additional Revelations**

125.    On June 27, 2022, *The Wall Street Journal* published an article entitled "Biotech Wizard Left a Trail of Fraud – Prosecutors Allege it Ended in Murder." The article revealed new information previously undisclosed by the Hindenburg Report.   Specifically, *The Wall Street Journal* article revealed that Eric Leire, Enochian's former chief executive, said "he began to suspect that Mr. Gumrukcu had fabricated his resume and held neither a medical degree nor a doctoral degree." The article further reported that Leire said he was fired in 2019 after raising his concerns with the Enochian Board, quoting him as saying "I thought the guy was a liar.  Maybe just, you know, taking liberty with science."

126.    On this news, Enochian's stock fell again to close at $2.47 on June 28, 2022, down from a pre-revelation price of $5.26.

127.    Taken together, the revelations about the Company's false and misleading statements in the Hindenburg Report and *The Wall Street Journal* article accounted for a 53% drop in the Company's stock price.

**VI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE**

128.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the

false or misleading statements and omissions alleged herein. The statements and omissions complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made.

129. To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (i) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures Enochian or other Defendants made were not sufficient to shield Defendants from liability, and (ii) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of Enochian who knew that the statement was untrue or misleading when made.

## VII. PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE

130. Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the market for Enochian common stock was efficient for the following reasons, among others:

a. Enochian's common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

b. The average weekly trading volume of Enochian's common stock was significant and amounted to 590,992 shares during the Class Period;

c. As a regulated issuer, Enochian filed public reports with the SEC and the NASDAQ;

d.    Enochian was eligible to file simplified SEC filings;

e.    Enochian regularly and publicly communicated with investors through established market communication channels, including through the regular dissemination of news releases through major newswire services, communications with the financial press, and other wide-ranging public disclosures;

f.    Numerous securities and credit analysts followed Enochian and wrote reports that were published, distributed, and entered the public domain; and

g.    The price of Enochian common stock reacted quickly to news.

131. Accordingly, the market for Enochian common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Enochian common stock. Under these circumstances, all purchasers of Enochian common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices. A presumption of reliance therefore applies.

132. In addition, or in the alternative, Lead Plaintiff is entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

## VIII.   CLASS ACTION ALLEGATIONS

133. Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following proposed class: all persons and entities who purchased or otherwise acquired Enochian common stock from January 17, 2018, and June 27, 2022, both dates inclusive, and who were damaged thereby.

134. Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Enochian and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Enochian's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

135. The Class is so numerous that joinder of all members is impracticable. Lead Plaintiff believes that the Class members number at least in the thousands. Throughout the Class Period, Enochian common stock had an average daily volume on the NASDAQ of approximately 590,992. As of May 31, 2022, Enochian had nearly 53 million shares of common stock outstanding.

136. Lead Plaintiff's claims are typical of the claims of Class members. All Class members are similarly situated in that they sustained damages by acquiring Enochian common stock at prices artificially inflated by the wrongful conduct complained of herein.

137. Lead Plaintiff will fairly and adequately protect the interests of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interest that conflicts with those of the Class.

138. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include, but are not limited to, the following:

a. Whether Defendants' conduct violated the federal securities laws, as alleged herein;

AMENDED CLASS ACTION COMPLAINT                                          8:22-cv-01374-JWH-JDE

45

b.    Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

c.    Whether Defendants acted with scienter as to Lead Plaintiff's claims for relief under Section 10(b) of the Exchange Act;

d.    Whether the Individual Defendants were controlling persons under Section 20(a) of the Exchange Act;

e.    Whether and to what extent the prices of Enochian common stock were artificially inflated or maintained during the Class Period due to the misstatements and omissions complained of herein; and

f.    Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

139.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

140.   There will be no difficulty in the management of this action as a class action.  Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail and by publication, using a form of notice similar to that customarily used in securities class actions.

**IX.  CLAIMS FOR RELIEF**

**COUNT I**
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Enochian, Dybul, and Sindlev**

141.   Lead Plaintiff incorporates ¶¶1—140 by reference as if fully set forth herein.

142. During the Class Period, Enochian, Dybul, and Sindlev made, disseminated, or approved the false and misleading statements specified above, which they knew or were deliberately reckless in disregarding were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

143. Enochian, Dybul, and Sindlev violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

    a.    Employed devices, schemes, and artifices to defraud;

    b.    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Enochian common stock during the Class Period.

144. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Enochian common stock. Lead Plaintiff and the Class would not have purchased Enochian common stock at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially inflated by Enochian's, Dybul's, and Sindlev's false and misleading statements and omissions.

145. As a direct and proximate result of Enochian's, Dybul's, and Sindlev's wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Enochian common stock during the Class Period.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
### Against the Sindlev, Dybul, and Sandler

146. Lead Plaintiff incorporates ¶¶ 1–140 by reference as if fully set forth herein.

147. During the Class Period, the Sindlev, Dybul, and Sandler acted as controlling persons of Enochian within the meaning of § 20(a) of the Exchange Act. By virtue of their positions of control and authority as officers of Enochian, the Individual Defendants had the power and authority to direct the management, policies, and activities of the Company and its employees, including its decision-making process, and to cause the Company to engage in the wrongful conduct complained of herein. The Individual Defendants were able to and did influence and control, directly and indirectly, the content of the public statements made by Enochian during the Class Period, including the materially false and misleading statements and omissions alleged herein. By reason of such conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

## X.   JURY TRIAL DEMAND

148. Lead Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury.

## XI.  PRAYER FOR RELIEF

149. WHEREFORE, Lead Plaintiff prays for relief as follows:

a.  Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.  Awarding Lead Plaintiff and the Class damages, including interest;

c.  Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees; and

d.  Granting such other and further relief as the Court may deem just and proper.

Dated: December 15, 2023

Respectfully submitted,

By: */s/ Joseph A. Fonti*

**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti (*pro hac vice*)
jfonti@bfalaw.com
7 Times Square, 27th Floor
New York, New York 10036
Tel: (212) 789-1340
Fax: (212) 205-3960

– and –

Javier Bleichmar (*pro hac vice*)
jbleichmar@bfalaw.com
Ross Shikowitz (*pro hac vice*)
rshikowitz@bfalaw.com
7 Times Square, 27th Floor
New York, New York 10036
Tel: (212) 789-1340
Fax: (212) 205-3960

*Counsel for Lead Plaintiff Jean-Pierre Murray and Lead Counsel for the Putative Class*

– and –

Brian Schall (SBN 290685)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Jean-Pierre Murray*

AMENDED CLASS ACTION COMPLAINT                    8:22-cv-01374-JWH-JDE

# Exhibit A

## CERTIFICATION

I, Jean-Pierre Murray, hereby certify as follows:

1.      I have reviewed the Amended Class Action Complaint for Violations of the Federal Securities Laws against Renovaro BioSciences Inc. f/k/a Enochian Biosciences f/k/a DanDrit Biotech USA, Inc. ("Renovaro") and others (the "Complaint") and authorized its filing.

2.      I did not purchase or sell securities of Renovaro that are the subject of the Complaint at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as lead plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary. I fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the benefit of the Class.

4.      My transactions in Renovaro common stock that are the subject of the Complaint during the class period specified therein of January 17, 2018 through June 27, 2022, inclusive, are reflected in Schedule A, attached hereto.

5.      Other than in the instant action, I have not sought to serve as lead plaintiff in a class action filed under the federal securities laws in the last three years.

6.      Beyond my pro rata share of any recovery, I will not accept payment for serving as lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

7.      I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this __15th__ day of December, 2023.

Jean-Pierre Murray

**SCHEDULE A**

TRANSACTIONS IN

ENOCHIAN BIOSCIENCES, INC. (F/K/A DANDRIT BIOTECH USA INC.)

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 02/20/2018 | 5,865.00 | 7.00 | ($41,055.00) |
| Purchase | 02/20/2018 | 600.00 | 7.10 | ($4,260.00) |
| Purchase | 02/20/2018 | 535.00 | 7.00 | ($3,745.00) |
| Purchase | 02/20/2018 | 14,250.00 | 6.99 | ($99,612.00) |
| Purchase | 02/21/2018 | 3,000.00 | 6.75 | ($20,250.00) |
| Purchase | 03/15/2018 | 100.00 | 5.70 | ($570.00) |
| Purchase | 03/15/2018 | 1,512.00 | 5.98 | ($9,041.64) |
| Purchase | 03/16/2018 | 9,100.00 | 6.00 | ($54,600.00) |
| Purchase | 03/21/2018 | 300.00 | 6.30 | ($1,890.00) |
| Purchase | 03/22/2018 | 23,079.00 | 6.29 | ($145,176.49) |
| Purchase | 03/26/2018 | 500.00 | 5.90 | ($2,950.00) |
| Purchase | 03/27/2018 | 2,000.00 | 5.90 | ($11,800.00) |
| Purchase | 03/27/2018 | 1,000.00 | 5.90 | ($5,900.00) |
| Purchase | 03/27/2018 | 1,400.00 | 5.90 | ($8,260.00) |
| Purchase | 03/27/2018 | 1,000.00 | 5.90 | ($5,900.00) |
| Purchase | 03/27/2018 | 1,000.00 | 5.90 | ($5,900.00) |
| Purchase | 04/19/2018 | 2,000.00 | 4.97 | ($9,940.00) |
| Purchase | 04/19/2018 | 100.00 | 4.96 | ($496.00) |
| Purchase | 04/19/2018 | 900.00 | 4.99 | ($4,491.00) |
| Purchase | 07/02/2018 | 5,000.00 | 3.54 | ($17,675.00) |
| Purchase | 07/02/2018 | 5,000.00 | 3.54 | ($17,675.00) |
| Purchase | 07/02/2018 | 2,317.00 | 3.54 | ($8,190.60) |
| Purchase | 07/02/2018 | 265.00 | 3.85 | ($1,020.25) |
| Purchase | 07/02/2018 | 2,000.00 | 4.30 | ($8,600.00) |
| Purchase | 10/19/2018 | 5,000.00 | 5.80 | ($29,000.00) |
| Purchase | 10/19/2018 | 418.00 | 5.85 | ($2,445.30) |
| Purchase | 10/19/2018 | 5,000.00 | 5.85 | ($29,250.00) |
| Purchase | 10/19/2018 | 5,000.00 | 5.85 | ($29,250.00) |
| Purchase | 11/05/2018 | 3,174.00 | 6.38 | ($20,250.12) |
| Purchase | 11/05/2018 | 4,826.00 | 6.38 | ($30,789.88) |
| Purchase | 11/05/2018 | 200.00 | 6.38 | ($1,276.00) |
| Purchase | 03/06/2019 | 4,720.00 | 6.35 | ($29,972.00) |
| Purchase | 03/06/2019 | 280.00 | 6.32 | ($1,769.60) |
| Purchase | 03/06/2019 | 5,000.00 | 6.32 | ($31,600.00) |
| Purchase | 03/06/2019 | 391.00 | 6.18 | ($2,416.38) |
| Purchase | 03/06/2019 | 5,000.00 | 6.20 | ($30,999.50) |
| Purchase | 03/06/2019 | 5,000.00 | 6.20 | ($30,993.00) |
| Purchase | 03/06/2019 | 4,609.00 | 6.20 | ($28,575.34) |
| Purchase | 03/06/2019 | 1,000.00 | 6.23 | ($6,229.90) |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 03/06/2019 | 300.00 | 6.22 | ($1,866.00) |
| Purchase | 03/06/2019 | 100.00 | 6.25 | ($625.00) |
| Purchase | 03/06/2019 | 100.00 | 6.27 | ($627.00) |
| Purchase | 03/06/2019 | 3,700.00 | 6.31 | ($23,347.00) |
| Purchase | 03/06/2019 | 4,100.00 | 6.32 | ($25,909.95) |
| Purchase | 03/06/2019 | 700.00 | 6.32 | ($4,420.99) |
| Purchase | 03/06/2019 | 100.00 | 6.30 | ($630.00) |
| Purchase | 03/06/2019 | 1,700.00 | 6.35 | ($10,795.00) |
| Sale | 11/08/2021 | -5,000.00 | 9.40 | $47,000.00 |
| Sale | 11/08/2021 | -42.00 | 9.44 | $396.48 |
| Sale | 11/08/2021 | -26.00 | 9.43 | $245.18 |
| Sale | 11/08/2021 | -4,932.00 | 9.42 | $46,459.93 |
| Sale | 11/08/2021 | -258.00 | 9.37 | $2,417.49 |
| Sale | 11/08/2021 | -8,742.00 | 9.35 | $81,737.70 |
| Sale | 11/08/2021 | -3,000.00 | 9.40 | $28,200.00 |
| Sale | 11/08/2021 | -7,000.00 | 9.43 | $66,010.00 |
| Sale | 11/10/2021 | -9,000.00 | 9.40 | $84,600.00 |
| Sale | 11/10/2021 | -3,826.00 | 9.75 | $37,303.50 |