**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti (*pro hac vice*)
300 Park Avenue, Suite 1301
New York, New York 10022
jfonti@bfalaw.com
Tel: (212) 789-1340
Fax: (212) 205-3960

*Counsel for Lead Plaintiff Jean-Pierre Murray,*
*and Lead Counsel for the Class*

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT CHOW, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENOCHIAN BIOSCIENCES INC., MARK DYBUL, RENE SINDLEV, and CARL SANDLER,<br><br>Defendants. | Case No. 8:22-cv-01374-JWH-JDE<br><br>CLASS ACTION<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:        June 28, 2024<br>Time:        9:00 A.M.<br>Courtroom:  9D, 9th Floor<br>Judge:       Hon. John W. Holcomb |

# TABLE OF CONTENTS

**PAGE**

I.    PRELIMINARY STATEMENT ..........................................................................5

II.   RELEVANT FACTS ......................................................................................7

    A.   Enochian's Formation.......................................................................7

    B.   Defendants Repeatedly Tout Gumrukcu and His Purported Inventions ......9

    C.   Defendants Concealed Gumrukcu's Sordid Past.......................................11

    D.   Predictably, Gumrukcu's Drugs Never Progressed....................................12

    E.   The Truth Emerged...........................................................................13

III.  LEGAL STANDARD ....................................................................................14

IV.   DEFENDANTS IMPROPERLY INSERT THEIR OWN VERSION OF THE FACTS ..........................................................................................15

V.    PLAINTIFF RAISES A STRONG INFERENCE OF SCIENTER..............16

    A.   Defendants Repeatedly Touted Gumrukcu's Background In the Face of Numerous Contrary Facts and Warnings.......................................16

    B.   Enochian's Entire Business Revolved Around Gumrukcu .........................20

    C.   Defendants Were Personally Motivated to Conceal Gumrukcu's Past......22

    D.   Enochian's Payment Structure Supports a Strong Inference of Scienter ...23

    E.   Holistically, Scienter Is the Only Cogent Inference ..................................23

VI.   PLAINTIFF STATES 20(A) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ..........................................................................................24

VII.  CONCLUSION .............................................................................................25

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)......................................................15

*In re Apollo Grp., Inc. Sec. Litig.*,
395 F. Supp. 2d 906 (D. Ariz. 2005)..................................................................18

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)....................................................................*passim*

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)......................................................22

*In re Cylink Sec. Litig.*,
178 F. Supp. 2d 1077 (N.D. Cal. 2001) ..............................................................25

*DSAM Glob. Value Fund v. Altris Software, Inc.*,
288 F.3d 385 (9th Cir. 2002)..............................................................................19

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024)..............................................................................14

*In re Hienergy Techs., Inc. Sec. Litig.*,
2005 WL 3071250 (C.D. Cal. Oct. 25, 2005)......................................................19

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000)......................................................................15, 25

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005)................................................................25

*Karimi v. Deutsche Bank Aktiengesellschaft*,
607 F. Supp. 3d 381 (S.D.N.Y. 2022)................................................................18

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018).....................................................................5, 6, 16

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ...............................................................21

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v.*
  *Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003)................................................................................20

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010)...........................................................................15, 16

*Poptech, L.P. v. Stewardship Inv. Advisors, LLC*,
  849 F. Supp. 2d 249 (D. Conn. 2012) ................................................................18

*Ruble v. Rural/Metro Corp.*,
  2001 WL 1772319 (D. Ariz. Jan. 26, 2001) .......................................................19

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016)...............................................................................14

*Skilstaf, Inc. v. CVS Caremark Corp.*,
  669 F.3d 1005 (9th Cir. 2012)........................................................................14, 15

*In re Stable Rd. Acquisition Corp.*,
  2022 WL 2762213 (C.D. Cal. July 13, 2022) ..................................................6, 18

*Stanley v. Schmidt*,
  369 F. Supp. 3d 297 (D. Mass. 2019) .................................................................20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ......................................................................................15, 23

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
  282 F. Supp. 3d 1074 (N.D. Cal. 2017) ..............................................................21

*Wietschner v. Monterey Pasta Co.*,
  294 F. Supp. 2d 1102 (N.D. Cal. 2003) ..............................................................22

## I.   PRELIMINARY STATEMENT[1]

This Securities Exchange Act class action revolves around Defendants' repeated false statements concerning the credentials of Serhat Gumrukcu, Enochian's "Co-Founder and Inventor."  Throughout the Class Period, Defendants publicly and repeatedly lauded Gumrukcu as a "rare genius," someone who was "not bound by scientific discipline or dogma," and who was "Leonardo Da Vinci, Nikola Tesla, and Einstein in one and the same person."  Enochian's public statements highlighted his supposedly sterling credentials (including medical and PhD degrees) and his purported research and study in various fields around the world.

None of that was true.  Gumrukcu was not a doctor or a researcher.  He was a lifelong con-man, who had accepted money to administer bogus medical treatments to patients who subseqently died; cheated business partners out of investments by forging documents and impersonating others; and murdered an associate who threatened to expose his crimes.

In their motion to dismiss, Defendants wisely do not challenge that their statements about Gumrukcu's credentials were false.  They clearly were.  Instead, Defendants argue only that they lacked scienter.  Unable to do that based on the well-pled allegations in the Complaint, Defendants improperly resort to a tactic specifically prohibited by the Ninth Circuit: spinning a counternarrative based on 26 exhibits they seek to introduce from outside the Complaint in order to "insert their own version of events" and "disput[e] the factual allegations in the complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002–03 (9th Cir. 2018).  Specifically, Defendants introduce numerous Enochian SEC filings, pleadings that they submitted in other cases, deposition testimony, materials from the U.S. Patent

---

[1] All references to ¶ __ are to paragraphs in the Amended Complaint for Violations of the Federal Securities Laws, ECF No. 68 (the "Complaint").  Capitalized terms not defined herein have the meanings set forth in the Complaint.  All internal citations and quotations omitted, and emphases added, unless otherwise stated.

and Trademark Office, and news reports in an improper effort to persuade the Court that, as an undisputed factual matter, Enochian "was convinced Gumrukcu was a doctor – just like the rest of the medical community." (Mot. at 26.)  This is clearly a factual dispute and Defendants' efforts to spin this counternarrative at the pleading stage is entirely improper. *Khoja*, 899 F.3d at 1003.

Of course, Defendants were forced to pursue this counternarrative strategy because the allegations in the Complaint plainly raise a strong inference of scienter. While falsely touting Gumrukcu's credentials, Defendants were confronted by numerous contrary facts that they not only disregarded but also actively surpressed. For instance, former Enochian senior executives, including the CEO and CFO, raised concerns about Gumrukcu and payments that the Company was making to Gumrukcu, including raising concerns to Enochian's Board of Directors that Gumrukcu had fabricated his resume.  Rather than address these disturbing facts about Gumrukcu, Defendants chose instead to promptly terminate both the CEO and CFO. ¶¶ 57, 77, 84.  Similarly, numerous publications raised serious questions about Gumrukcu's criminal past and his lack of credentials, to which the Defendants responded by doubling down on their false statements and reassuring investors that they had looked into Gumrukcu's qualifications.  ¶¶ 59–61, 63.  Defendants' insistence on continuing to tout Gumrukcu's bogus *bona fides* in the face of these facts and active suppression of any contrary suggestions are the very definition of deliberate recklessness and willful blindness. *See In re Stable Rd. Acquisition Corp.*, 2022 WL 2762213, at *12 (C.D. Cal. July 13, 2022).

What's more, Gumrukcu's credentials and the validity of his science were "prominent enough [to Enochian] that it would be absurd to suggest that top management was unaware of them." *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 989 (9th Cir. 2008).  Indeed, Defendants advertised Gumrukcu to investors as Enochian's "Co-Founder and Investor," and investors were told that Enochian's "future performance will depend on our ability to retain" him.  ¶ 92.  In short,

Defendants based their entire Company around Gumrukcu's purported HIV/AIDS cure, which accounted for a staggering 88% of the Company's total assets.

Defendants' sole response to these allegations is to disregard them and instead spin their own version of the facts. Putting aside the impropriety of that approach, their counternarrative that they were duped just the same as everyone else is not plausible (and certainly not more plausible than that they acted at least recklessly). Unlike the Defendants, no one else had the same access to Gumrukcu, based their entire company around him and his science, repeatedly told investors about his sterling credentials and brilliant scientific mind, assured investors they had conducted due diligence into him, or, most importantly, had the same obligations to not make false and misleading statements.

Defendants' fraud was finally revealed in mid-2022, after Gumrukcu was arrested by federal authorities on May 25, 2022, for the murder of a business associate. Subsequent to the arrest, on June 1, 2022, Hindenburg Research published a report revealing, among other things, that Gumrukcu held no medical or other advanced degrees, was not licensed to practice medicine, and had a long history of fraudulent activity. Hindenburg also published an interview with Defendant Sindlev, in which he admitted that he knew about Gumrukcu's fraud felony conviction, but chose not to disclose it. Further revelations appeared in a June 27, 2022, *Wall Street Journal* article, which reported that Enochian's former CEO had raised concerns about Gumrukcu and was fired as a result. On the news of these revelations, Enochian's stock price dropped by 53%.

## II. RELEVANT FACTS

### A. Enochian's Formation

Enochian was formed in 2018. Prior to its formation, Enochian was known as DanDrit Biotech USA, a publicly traded biopharma company. ¶¶ 3, 33. By early 2017, Defendant Sindlev acquired a controlling interest in DanDrit. ¶ 30. Shortly thereafter, Sindlev hired Gumrukcu ostensibly as a "consultant to improve the

efficacy of [DanDrit's] vaccine protocol MCV" and paid him nearly $300,000 in cash and stock. *Id.* But DanDrit was a failing company with limited commercial prospects and a lead product that had never worked. ¶ 31. To save himself from his failed investment, Sindlev engineered a series of business formations and combinations revolving around Gumrukcu's bogus science, which allowed Sindlev to create value out of thin air and leverage that value to attract investors.

First, in early March 2017, at or around the same time that Sindlev acquired control over DanDrit, Gumrukcu incorpoated Weird Science LLC, with Gumrukcu's husband, W. Anderson Wittekind, as the sole manager of the entity at that time. ¶ 32. Later, Defendant Sandler, an independent Enochian director from February 2018 to March 2022, would also become a member and manager of Weird Science. ¶ 20. Then, in May 2017, Gumrukcu and Wittekind created Enochian Biopharma as a subsidiary of Weird Science. ¶ 32. The stated corporate purpose for both Weird Science and Enochian Biopharma was to identify, develop, manufacture, and commercialize gene-modified cell therapy. *Id.*

Just a few months later, Sindlev triggered his plan. According to public filings, on July 14, 2017, Sindlev's DanDrit loaned Gumrukcu's Weird Science $500,000 ostensibly to fund pre-clinical study programs, and also signed a letter of intent to acquire Enochian Biopharma from Weird Science, including the license to the HIV and AIDS treatment Gumrukcu was purportedly developing. ¶ 33. At the same time, Weird Science (and thus Gumrukcu) received 50% ownership in DanDrit and immediate forgiveness of the $500,000 loan. *Id.* The transaction closed in February 2018, at which time DanDrit changed its name to Enochian. *Id.* Sindlev publicly characterized the transaction as him paying Gumrukcu $500,000 and 50% of the company in exchange for Gumrukcu's purported HIV/AIDS cure.

**B.    Defendants Repeatedly Tout Gumrukcu and His Purported Inventions**

The Enochian entity created by Sindlev and Gumrukcu was built almost entirely around Gumrukcu and his purported intellectual property. The purported HIV/AIDS treatment acquired from Gumrukcu was formally referred to as ENO-1001 (later renamed to ENOV-HV-001) and was immediately identified in Enochian's public filings as its "lead candidate." ¶ 34. Significantly, it was also listed as Enochian's single most valuable asset. On Enochian's May 15, 2018 Form 10-Q, it was listed as an "Indefinite Life Intangible Asset" worth $127,771,376 – a staggering 88% of Enochian's total assets at the time. *Id.* In subsequent filings throughout the Class Period, that number would fluctuate between $152 million and $154 million. ¶ 79.

That valuation was fabricated. Public filings indicate that Enochian Biopharma (Gumrukcu's former entity) had incurred only $265,000 in research and development costs related to the drug's purported development. However, because Defendants engineered the acquisition the way they did, they were able to record the asset at "fair value" on the acquirer's balance sheet, instead of recording just the research and expenses that were incurred. ¶ 35. What's more, the fair "value" that was recorded by a firm called Noble Capital Markets was itself flawed. Specifically, the analysis assumed that Enochian's HIV/AIDS cure would be approved in 2023 and would cost $45 million (which was wildly unrealistic), and, critically, did not include any diligence into the drug's primary researcher, Gumrukcu. ¶ 36.

Having inflated the value of Gumrukcu's intellectual property and built the Company entirely around that intellectual property, Defendants repeatedly and falsely touted Gumrukcu's credentials and his supposed sparkling background:

- He was identified on Enochian's website as the Company's "Inventor and Co-Founder." ¶ 39.

- Enochian's founding documents described Gumrukcu as the "sole inventor of all Company IP rights and Company Technology." ¶ 107.

- In a video posted to Enochian's website in March 2019, Defendant Dybul told investors that "Enochian's inventor, Dr. Serhat has the type of brilliance that has the capacity to see across disciplines in science and connect things that others don't see.  And that's exactly what he's done to create the most innovative approaches to HIV and oncology that I know of."  ¶¶ 4, 93.

- A few months later, in a November 25, 2019 press release, Dybul again touted Gumrukcu as "one of those rare geniuses that is not bound by scientific discipline or dogma."  ¶¶ 4, 61, 97.

- Enochian's website provided a detailed profile of Gumrukcu, which, among other things, stated that he received initial medical training at Dokuz Eylul University in Turkey in 2004, received a medical degree at First Moscow State University in 2006, completed his first residency in medical genetics in 2008, holds a PhD degree from RUDN University, and was licensed by Turkey's Ministry of Health. ¶¶ 61, 66, 94–96.

- In various SEC filings, Defendants stated that "[m]any of the techniques utilized in the development of our product candidates have been developed by Dr. Serhat Gumrukcu, and we rely on the services of Dr. Gumrukcu. . . . Our future performance will depend on our ability to retain the services of Dr. Gumrukcu.  ¶ 92.

- Defendant Sindlev told Danish news outlet *Okonomisk Ugebrev* that "[o]ur researcher and inventor is the biotech world's answer to Zuckerberg, Bill Gates, and Larry Page.  People close to him compare him to Leonardo Da Vinci, Nikola Tesla, and Einstein in one and the same person."  ¶ 67.

### C.    Defendants Concealed Gumrukcu's Sordid Past

Unbeknownst to investors, Defendants' representations were false and Gumrukcu was not a doctor.  He was in fact a dangerous con-man, whose deception Defendants leveraged to make Enochian appear valuable to investors.  Gumrukcu's indiscretions included accepting payments to illegally administer bogus medical treatments to patients who susbequently died, ¶¶ 40–41; forging business documents to swindle money from would-be real estate investors, ¶¶ 43–44; setting up fraudulent commodities deals based on phony documentation, ¶¶ 45–46; and murdering business partners who threated to expose him, ¶¶ 46–47.

When Defendants were confronted by Gumrukcu's past, they actively concealed it.  For example, as early as 2019, former Enochian CEO Eric Leire began to suspect that Gumrukcu fabricated his resume and held neither a medical degree nor a doctoral degree.  ¶¶ 57, 114.  When Leire brought these concerns to the attention of Enochian's Board of Directors, he was terminated.  *Id.*

The same thing happened to former Enochian CFO Robert Wolfe.  Shortly after he became CFO in June 2017, Wolfe became aware that Enochian was spending "significant sums" on retaining companies affiliated with Gumrukcu.  ¶ 84.  He expressed his concerns and was subsequently terminated in December 2018; he was told he was terminated because he was continuing to raise concerns about Gumrukcu.  *Id.*  Not only was Wolfe terminated, but after he filed a wrongful termination suit in Danish court, the Defendants counter-sued him in Vermont state court, contending that Wolfe's wrongful termination suit threatened to inform investors about Gumrukcu's past, which would cast doubt on the Company's transactions with him.  ¶ 85.  In short, they sued him because he threatened to unravel their fraud.

Defendants were also confronted by numerous external sources and media outlets that questioned Gumrukcu's credentials.  In response, the Defendants time-and-again reasserted the same false statements.  ¶ 8.

On November 19, 2019, White Diamond Research published a report commenting on Gumrukcu's criminal background and noting that they could not confirm his academic history.  ¶ 59.  In response, Defendants cited purported testimonials in support of Gumrukcu and provided a detailed profile of Gumrukcu in which they doubled-down on his false academic and medical credentials.  ¶¶ 60–61.

Likewise, in January 2020, Danish news outlet *MedWatch* published an article raising questions about Gumrukcu's lack of research and highlighting his involvement in civil lawsuits.  ¶ 63.  In response, Defendant Dybul affirmed Gumrukcu's aptitude for science, reiterating that Gumrukcu had the necessary qualifications before comparing him to Bill Gates and Albert Einstein.  *Id.*

### D.   Predictably, Gumrukcu's Drugs Never Progressed

Of course, given his lack of credentials, Gumrukcu's purported HIV/AIDS treatment never got off the ground.  In Enochian's SEC filings and investor presentations during the Class Period, Defendants routinely stated that the Company was working towards an investigational new drug ("IND") application with the FDA.  ¶ 50.  Enochian further disclosed in 2019 that it was planning to meet with the FDA for an initial meeting for regulatory advice in anticipation of the IND submission.  ¶ 51.  But even after that initial meeting took place in 2020, the goal of submitting an IND, or even a pre-IND, never progressed.  In fact, in subsequent filings, Enochian continued to tell investors that it hoped to submit a pre-IND submission by the end of 2021, then by early 2022, then by late 2022, and eventually Enochian stopped talking about the pre-IND submission altogether.  *Id.*  Finally, in an October 2022 investor presentation, over four years after the license to Gumrukcu's IP was originally acquired, the Company indicated that the drug had moved backwards and was now considered a "proof of concept."  *Id.*

### E.    The Truth Emerged

On May 25, 2022, the U.S. Department of Justice announced that Gumrukcu had been arrested on charges of murder.  Although distancing themselves from Gumrukcu personally, Enochian's Board of Directors nevertheless stood behind his bogus science and "affirm[ed] its confidence in the Company's promising future." ¶ 70.  Indeed, the Board of Directors came out with a press release on the same day as the DOJ annoucement, "express[ing] unanimous and strong affirmation of the current position of the Company, the Management and the promising advancement of the Research and Development pipeline." ¶ 80.

On June 1, 2022, Hindenburg Research published a comprehensive report revealing Gumrukcu's lack of credentials, past frauds, and the inaccuracy of many of Defendants' public statements (the "Hindenburg Report").  ¶¶ 71–74. Specifically, based on its own investigation, Hindenburg revealed that Gumrukcu held *no* medical degrees, had a long history of fraud, and was prosecuted and convicted for some of his past frauds. ¶ 123.  The Hindenburg Report also revealed an interview it had conducted with Sindlev, in which Sindlev admitted that he knew about Gumrukcu's felony conviction but chose not to disclose it to investors because the court records were purportedly public. ¶ 75.  Sindlev also shifted his story about whether and to what extent he and others had looked into Gumrukcu's background. At first, Sindlev said that he personally, along with Enochian, had verified Gumrukcu's credentials as part of the due diligence process (which, as noted above, was *not* part of the Noble Capital report), but then later pivoted to a claim that he had relied on others to validate Gumrukcu's credentials and expertise. *Id.*  On the news of the Hindenburg Report, Enochian's stock price fell by 29% on a single day on June 1, 2022. ¶ 124.

Further revelations appeared in a June 27, 2022 article in *The Wall Street Journal*.  Specifically, the article revealed that former CEO Leire had been fired in 2019 after raising his suspicions about Gumrukcu's credentials to Enochian's Board

of Directors.  ¶ 125.  On this news, Enochian's stock fell again.  Combined, the Hindenburg Report and *The Wall Street Journal* article caused a 53% drop in the Company's stock price.  ¶¶ 126–27.

Finally, with Gumrukcu's past now fully exposed, Defendants could no longer justify the inflated valuation of his purported intellectual property and were forced to take an impairment charge.  On February 27, 2023, Enochian filed a Form 10-K – the first since the truth about Gumrukcu was revealed – in which it reported an impairment loss on Gumrukcu's intellectual property of over $93 million for the year ended June 30, 2022.  ¶ 81.  On October 2, 2023, Enochian filed another Form 10-K, in which it reported an additional impairment of almost $19 million for the year ended June 30, 2023.  *Id.*

## III.   LEGAL STANDARD

On a motion to dismiss, the court "accept[s] all factual allegations in the complaint as true and constru[es] them in the light most favorable to the [plaintiff]." *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012).

"To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission (falsity), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation."  *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024).  Here, Defendants challenge only the element of scienter.  (Mot. at 19).

Scienter is a mental state that not only includes knowledge, "but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). Courts find deliberate recklessness when a defendant "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [s/]he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390

(9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

The scienter "inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007) (emphasis in original). The inference "need not be irrefutable … or even the most plausible," or require a "smoking-gun." *Id.* at 324–26. It is "strong" when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of non-fraudulent intent. *Id.* at 310. In other words, "the tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). Plaintiff readily satisfies this standard.

## IV. DEFENDANTS IMPROPERLY INSERT THEIR OWN VERSION OF THE FACTS

It is axiomatic that the allegations in the Complaint are "accept[ed] … as true and constru[ed] [] in the light most favorable to the [plaintiff]." *Skilstaf*, 669 F.3d at 1014. But since Defendants are unable to challenge Plaintiff's well-pled allegations on their face, they instead go well outside the Complaint, relying on 26 external exhibits to establish as undisputed the purported facts that Enochian "was convinced Gumrukcu was a doctor – just like the rest of the medical community," (Mot. at 26); that "Gumrukcu's research impresse[d] the medical community," (Mot. at 11); and that Gumrukcu was working towards viable product development (*see, e.g.*, Mot. at 14).

But these questions of scientific viability and whether and to what extent the Defendants had knowledge of Gumrukcu's false credentials are central to this case and squarely in dispute. For example, Defendants' factual assertions that Enochian met with the FDA to discuss drug applications and that "Gumrukcu's early ideas

were showing concrete promise" (Mot. at 14) are misleading at best because those purported drugs never existed in the first place and never progressed. ¶¶ 48–51.

Ninth Circuit law is clear: Defendants cannot exploit the judicial notice and incorporation by reference doctrines to improperly "insert their own version of events" and "disput[e] the factual allegations in the complaint." *Khoja*, 899 F.3d at 1002–03. Indeed, the Defendants are guilty of the "concerning pattern in securities cases" admonished by the Ninth Circuit where defendants "exploit[] these procedures" and make "unscrupulous use of extrinsic documents to resolve competing theories against the complaint." *Id*. at 998. The Court should reject their attempt to insert these purported facts.[2]

## V.    PLAINTIFF RAISES A STRONG INFERENCE OF SCIENTER

### A.    Defendants Repeatedly Touted Gumrukcu's Background In the Face of Numerous Contrary Facts and Warnings

Throughout the Class Period, Defendants were confronted with numerous warnings about Gumrukcu that raised "reasonable grounds to believe material facts existed that were misstated or omitted [*i.e.*, repeated statements about Gumrukcu's background], but [Defendants] nonetheless failed to obtain and disclose such facts although [they] could have done so without extraordinary effort." *In re Oracle Corp.*, 627 F.3d at 390.

Specifically, Defendants were confronted with the following:

- Former CEO Eric Leire raised concerns to Enochian's board of directors saying "he began to suspect that Mr. Gumrukcu had fabricated his resume and held neither a medical degree nor a doctoral degree." He was fired in 2019 after raising these concerns. ¶¶ 12, 57, 77, 125.

---

[2] For the reasons set forth in Plaintiff's accompanying Response to Defendants' Request for Judicial Notice, the Court should reject Defendants' extraneous evidence because it impermissibly seeks to introduce new, external facts and thus improperly raises factual questions at the motion to dismiss stage. (*See generally* Plaintiff's Response to Defendants' Request for Judicial Notice.)

- Robert Wolfe became CFO in June 2017 and was terminated in December 13, 2018, for raising concerns about Gumrukcu and payments that were being made to Gumrukcu. ¶ 84.

- On November 19, 2019, White Diamond Research published a report commenting on Gumrukcu's criminal background and noting that they could not confirm his academic history. ¶ 59. In response, Defendants cited purported testimonials in support of Gumrukcu and provided a detailed profile of Gumrukcu in which they doubled-down on his false academic and medical background. ¶¶ 60–61.

- Likewise, in January 2020, Danish news outlet MedWatch published an article raising questions about Gumrukcu's lack of research and civil lawsuits. ¶ 63. In response, Defendant Dybul affirmed Gumrukcu's aptitude for science, reiterating that Gumrukcu had the necessary qualifications before comparing him to Bill Gates and Albert Einstein. *Id.*

- Sindlev admitted to Hindenburg that he had been aware of Gumrukcu's fraud felony conviction, but said nothing. ¶ 75.

Not only were Defendants confronted with these facts, they also admitted that Gumrukcu's credentials were something that they could and did look into closely. For example, when *MedWatch* reported on Gumrukcu's past in 2020, Defendant Dybul affirmed Gumrukcu's qualifications and Enochian claimed to have reviewed documentation proving Gumrukcu's educational background. ¶¶ 63–64. Sindlev also admitted to Hindenburg that the Defendants had done due diligence into Gumrukcu though his story was not entirely consistent: at first he said he and Enochian had verified Gumrukcu's credentials as part of the due diligence process, but later changed his story and said he relied on others to validate Gumrukcu's credentials and expertise. ¶ 75. Finally, Defendants admit in their Motion that "DanDrit conducted extensive due diligence on the value of Legacy Enochian's

intellectual property." (Mot. at 9 (citing Ex. 3 at 64).) Notably, Defendants never disclosed the nature or extent of that due diligence.

Defendants' conduct constitutes classic deliberate recklessness. *See In re Stable Rd.*, 2022 WL 2762213, at *12 (finding scienter where defendants failed to investigate red flags concerning acquisiton target's national security issues, while at the same touting their "extensive due diligence"); *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 397–99 (S.D.N.Y. 2022) (finding scienter related to statements about bank's internal vetting processes made with scienter where complaint alleged CEO's direct involvement in decisions related to high-risk, ultra-wealthy clients, and complaint identified reports of government investigations that provided red flags of bank's deficient systems); *Poptech, L.P. v. Stewardship Inv. Advisors, LLC*, 849 F. Supp. 2d 249, 270 (D. Conn. 2012) (scienter based in part on defendants ignoring red flags).

At a minimum, Defendant Sindlev admitted to Hindenburg that he knew about Gumrukcu's felony convictions but said nothing. ¶ 75. That by itself is fraud because "once defendants chose to tout [Gumrukcu's credentials], they were bound to do so in a manner that wouldn't mislead investors as to what [those credentials] consisted of." *Berson*, 527 F.3d at 987; *see also In re Apollo Grp., Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 919–20 (D. Ariz. 2005) ("[A]t the point Defendants chose to speak about the DOE investigation, they had a duty to speak fully and truthfully and such full disclosure would have included the negative DOE Report.").

Defendants argue that they are insulated from their reckless conduct because "Plaintiff fails to explain how Enochian's conduct was 'an extreme departure from ordinary care' when it was convinced Gumrukcu was a doctor – just like the rest of the medical community." (Mot. at 26.) Again, this is an improper attempt to inject a factual dispute at the pleading stage. But even putting that aside, Defendants are not similarly situated as the rest of the medical community. They had direct access to Gumrukcu and repeatedly told the investing community that he was a doctor and

had sparkling credentials. In a vacuum, it would be reckless to blindly take Gumrukcu's word when Defendants based almost the entire value of the Company around him and his science.

The cases cited by Defendants do not suggest otherwise. *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) involved allegations against a company's accounting firm and the reasonableness of its audit. That is not the same as the Defendants' touting the fictional biography of their own "Co-Founder and Inventor" in the face of numerous contraditory and concerning facts. And *Ruble v. Rural/Metro Corp.*, 2001 WL 1772319, at *10 (D. Ariz. Jan. 26, 2001) did not involve any allegations about how the defendants were put on notice; that is clearly not the case here.

*In re Hienergy Techs., Inc. Sec. Litig.*, 2005 WL 3071250, at *5–6 (C.D. Cal. Oct. 25, 2005) also misses the mark. Defendants rely on *Hienergy* to argue that "Plaintiff has provided no factual basis from which the Court can presume that Defendants had any knowledge of" Gumrukcu's past. (Mot. at 22.) But there, the plaintiff argued that the defendants should have known about others' checkered pasts solely "because he was doing business with them." *Hienergy*, 2005 WL 3071250, at *5. Here, Defendants were not merely "doing business" with Gumrukcu. They built their Company around him, were aware of numerous concerns about Gumrukcu, and then told investors that they had looked into his past. What's more, *Hienergy* was a failure to disclose case, *see id.*, whereas the Defendants here repeatedly made admittedly false statements about Gumrukcu's purported "genius." ¶¶ 4, 61. And having chosen to speak about Gumrukcu's credentials in such glowing terms, Defendants had a duty to do so truthfully and honestly. *Berson*, 527 F.3d at 987.

Defendants also contend that "[j]ust because Enochian did not discover what private investigators learned does not mean that it acted with deliberate recklessness." (Mot. at 27.) But that is not what Plaintiff alleges. Plaintiff alleges

that Defendants were confronted by numerous facts about Gumrukcu but ignored and downplayed them instead of investigating and disclosing. And just as with the rest of the medical community noted above, private investigators were not similarly situated as the Defendants.

Defendants cite only one out-of-circuit case, *Stanley v. Schmidt*, 369 F. Supp. 3d 297, 312–13 (D. Mass. 2019), in support of this argument. But *Stanley* was a summary judgment decision based on a review of the full factual record concerning alleged misstatements in a SEC Form ADV. Moreover, the record there concluded that the defendant *did* conduct an adequate investigation, noting that he asked relevant questions and investigated relevant SEC filings. *Id.* Here, there is no indication whatsoever (because the Defendants have never disclosed any indication) that the Defendants followed up in any meaningful way on the numerous red flags concerning Gumrukcu.

### B.   Enochian's Entire Business Revolved Around Gumrukcu

Defendants' failure to adequately investigate aside, Gumrukcu's credentials were "prominent enough [to Enochian] that it would be absurd to suggest that top management was unaware of them." *Berson*, 527 F.3d at 989 (quoting *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d 920, 941 n.21 (9th Cir. 2003)).

As noted above, Gumrukcu and his intellectual property were not just a core operation of Enochian, they were the *only* operation of Enochian. He was identified on Enochian's website as the Company's "Inventor and Co-Founder," ¶ 39; Enochian's founding documents described him as the "sole inventor of all Company IP rights and Company Technology," ¶ 107; and Defendants repeatedly told investors that the Company's "future performance will depend on our ability to retain the services of Dr. Gumrukcu," ¶ 92. Equally important, 88% of the Company's total assets consisted just of Gumrukcu's purported HIV/AIDS cure. ¶¶ 5, 34, 79. In short, Gumrukcu and his science were the entire company.

In that regard, Defendants' scienter here is even more evident than it was in *Berson*. There, the plaintiff alleged that the defendants failed to disclose stopwork orders received from a company's largest customers that accounted for more than 80% of the company's revenue. The Ninth Circuit noted that though the plaintiffs "allege no particular facts indicating that [the officers] actually knew about the stop-work orders," the officers "were directly responsible for [defendants'] day-to-day operations ... [and] it is hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work." *Berson*, 527 F.3d at 987–88. The Ninth Circuit thus concluded that the facts alleged "support the inference that the backlog statements were misleading when made. These facts were prominent enough that it would be absurd to suggest that top management was unaware of them." *Id.* at 989. The same is true here: Gumrukcu accounted for 88% of the Company's assets (higher than the 80% at issue in *Berson*) and Defendants were not only responsible for the day-to-day operations, they admitted that they were responsible for the due diligence into Gumrukcu. ¶¶64–75.

Likewise, in *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797 (C.D. Cal. 2011), the defendant company, a pharmaceutical producer, made misstatements related to governmental approval of a drug alleged to be "by an overwhelming margin the most important product in the Company." *Id.* at 814. Because obtaining approval of the drug "was understood by Defendants to be of paramount importance" and "absolutely integral to the company's success," the court concluded that "it would therefore "be absurd to suggest that management was without knowledge of the matter." *Id.* at 814–15.

And given the numerous concerns flagged to Defendants and their admitted focus on Gumrukcu's credentials, it is even more absurd to suggest they were unaware. *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1099–101 (N.D. Cal. 2017) ("Given the prominence of cross-selling in [the Company's] business, the close manner in which it was monitored, and the red flags

from the employee complaints, the Los Angeles Times article, and the investigations by regulatory agencies, it would be absurd to suggest that management was without knowledge of the matter.").

Defendants argue that being "intimately involved" with "a certain aspect of the business is not sufficient to plead scienter," and cite *Browning v. Amyris, Inc.*, 2014 WL 1285175, at \*15 (N.D. Cal. Mar. 24, 2014) and *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1115 (N.D. Cal. 2003) in support.  (Mot. at 28–29.)  But here, Plaintiff does not merely cite intimate involvement in a "certain aspect" of Enochian's business; he cites intimate involvement in the primary asset of the Company and with an individual upon whom Defendants told investors their "future performance will depend."  ¶ 92.  Plaintiff also cites specific instances when Defendants were put on notice as well as Defendants' statements that they were responsible for investigating Gumrukcu's background. ¶¶ 7, 8, 57–58, 60–61, 63–64, 75, 77, 84.  Neither *Browning* nor *Wietschner* have similar allegations.

### C.    Defendants Were Personally Motivated to Conceal Gumrukcu's Past

Adding to the scienter mix, Defendants were personally motivated to conceal Gumrukcu's sordid past.  Defendants Sandler and Dybul had direct interests in Gumrukcu's Weird Science entity.  ¶ 33.  For instance, on October 28, 2020, Dybul was assigned 450,568 shares of Weird Science, which were valued at approximately $1.2 million.  ¶ 55.  Meanwhile, Defendant Sandler, who was both a director of Enochian and a manager of Weird Science, ¶ 54, directly profited from Weird Science's success, even receiving a distribution of 992,273 shares of Weird Science stock worth approximately $7.5 million in April 2022, ¶ 56.  Accordingly, at the same time that Defendants' false and misleading statements were inflating Gumrukcu's credentials, Sandler and Dybul had direct, monetary incentives to ensure that the artificial inflation remained unchecked.  This supports the inference of scienter.

### D.    Enochian's Payment Structure Supports a Strong Inference of Scienter

Despite being held out as the Company's "Co-Founder and Inventor," the "sole inventor of all Company IP rights and Company Technology," and the person upon whom Enochian's "future performance . . .depended," ¶¶ 92, 107, Gumrukcu remained off the Company's payroll and never held an official position at the Company.  ¶ 108.  Instead, Enochian funneled money to various entities afiliated with Gumrukcu, including millions of dollars of payments to a company called G-Tech purportedly for personal security services for Gumrukcu.  ¶ 109.  Former Enochian CFO Wolfe alleged that this payment structure was deployed to evade scrutiny and circumvent securities regulations restricting the involvement of convicted felons in securities offerings, including Section 926 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.  ¶ 110.  Given Gumrukcu's central role in the Company, the unusual and suspicious payment structure, and the concerns highlighted by the former CFO (*i.e.*, the person responsible for and most intimitely familiar with Enochian's financial dealings), Enochian deliberately paying Gumrukcu in this circuitous manner instead of through the Company's books supports a strong inference of scienter.  That is because the Defendants knew there was no other way to structure the payments without inviting unwanted scrutiny.

### E.    Holistically, Scienter Is the Only Cogent Inference

Taken together, the inference of scienter is cogent and at least as (if not more) compelling as any alternative inference. *Tellabs*, 551 U.S. at 310. Defendants were repeatedly warned about Gumrukcu, both by senior executives within the Company and also numerous public news reports.  In response, they did not conduct a thorough investigation or temper their public statements, but rather terminated the employees who complained, ¶¶ 113–14;  dismissed the reports out of hand, ¶ 60; doubled-down on Gumrukcu's purportedly sterling credentials, ¶¶ 60–68; and reassured investors that they had done their due diligence, ¶¶ 63–64.  And these warnings about

Gumrukcu did not concern some obscure, insignficant component of the business. They all concerned the Company's single most important asset—intellectual property consisting of over 88% of the Company's portfolio—and its "co-founder and inventor" upon whom Defendants told investors the Company's "future performance. . . depended." ¶¶ 34, 92. Taken together, the inference that Defendants knew or were reckless in not knowing that Gumrukcu was a serial fraudster instead of a doctor is strong.

Meanwhile, Defendants' counternarrative that they were duped just like every one else is implausible, and by far the weaker inference. As an initial matter, that counternarrative is not based on the allegations in the Complaint, but rather 26 exhibits from outside the complaint that the Defendants improperly seek to introduce to sell their own version of events. As discussed above, that is improper at the pleading stage. *See infra* § IV. Defendants offer no competing inference based on the allegations in the complaint, and thus Plaintiff's inference is necessarily sufficient.

In any case, as discussed above, Defendants' narrative makes no sense. Defendants are not similarly situated as the rest of the medical community. The rest of the medical community did not have direct access to Gumrukcu; did not tell investors that they conducted "extensive due diligence" on him; did not create a company exclusively around him and his intellectual property; did not repeatedly tout his credentials; and most importantly, did not have a legal obligation to not disseminate false and misleading statements and omissions about Gumrukcu. In short, the Defendants are ***not*** the medical community at-large, and they are not held to the same standards.

## VI.    PLAINTIFF STATES 20(a) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

Defendants Dybul, Sindlev, and Sandler are controlling persons within the meaning of Section 20(a) of the Exchange Act. Defendants do not argue otherwise,

but simply contend that "Plaintiff's conclusory allegation that the individual Defendants are 'control persons' is insufficient." (Mot. at 30.) That is not what Plaintiff alleges here. Plaintiff alleges that Dybul, Sindlev, and Sandler were officers and directors of Enochian who were directly involved in the review and approval of Enochian's SEC filings. ¶ 22. What's more, Defendants Dybul and Sindlev were the direct speakers of numerous false and misleading statements. ¶¶ 93, 97–99.

This is sufficient at the motion to dismiss stage. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1031–32 (S.D. Cal. 2005) (finding allegations that defendants held positions as CEO and Chairman of the Board and described their roles were sufficient to show they were involved in the company's day-to-day business); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1079 (N.D. Cal. 2001) (finding sufficient for control person liability allegations that the individual defendants, "by virtue of their executive and managerial positions had the power to control and influence [the Company], which they exercised"); *see also Howard*, 228 F.3d at 1065 (determining who is a controlling person is usually an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions").

## VII. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied. Should the Court grant dismissal, Plaintiff respectfully requests leave to amend.

Dated: May 17, 2024

Respectfully submitted,

By:*/s/ Joseph A. Fonti*
**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti (*pro hac vice*)
jfonti@bfalaw.com
Javier Bleichmar (*pro hac vice*)
jbleichmar@bfalaw.com
300 Park Avenue, Suite 1301
New York, New York 10036

Tel: (212) 789-1340
Fax: (212) 205-3960

– and –

George N. Bauer (*pro hac vice* forthcoming)
gbauer@bfalaw.com
Ross Shikowitz (*pro hac vice*)
rshikowitz@bfalaw.com
75 Virginia Road, 2nd Floor
New York, New York 10603
Tel: (212) 789-1340
Fax: (212) 205-3960

*Counsel for Lead Plaintiff Jean-Pierre Murray and Lead Counsel for the Putative Class*

– and –

Brian Schall (SBN 290685)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Jean-Pierre Murray*